GOVERNMENT EMPLOYEES INSURANCE
COMPANY *v.* DeJAMES, ET AL.

[No. 199, September Term, 1969.]

*Decided February 10, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Arthur V. King* for appellant.

*David B. Lamb*, with whom was *George P. Lamb, Jr.* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

This case, one of first impression in Maryland, poses the question of the meaning to be ascribed to the word "collapse" in a homeowner's insurance policy.

In early 1965, Mr. and Mrs. Joseph R. DeJames moved into a new house near Beltsville in Prince George's County which they had purchased from Maryland Community Developers, Inc. (the Builder). The house was insured under a homeowner's policy issued by Government Employees Insurance Company (GEICO) for a term of three years, or until 31 January 1968, when the policy was renewed for an additional period of three years, expiring 31 January 1971.

Among the perils insured against by the policy was "Collapse (not settling, cracking, shrinkage, bulging or expansion) of building(s) or any part thereof * * *", but the coverage was specifically subjected to two exclusions, relieving GEICO from liability "* * * for loss caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, landslide, mud flow, earth sinking, rising or shifting * * *" as well as "for loss caused by, resulting from, contributed to or aggravated by * * * water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks,

driveways, foundations, walls, basement or other floors
* * *."

In October or November of 1965, the DeJameses noticed hairline cracks in the basement wall of the house, which the Builder repaired in February, 1966. In March of 1968, Mrs. DeJames heard a "very loud, dull thud" which sounded like "an explosion in the distance." Mrs. DeJames testified that when she went to the basement later that day, she saw an "indentation" near the floor of the basement wall, looked up and saw "hundreds of thousands of cracks." In response to a call the following day, the Builder erected a wooden framework to support the first floor joists and shored up the wall with timber supports.

When the Builder suggested that it would only make repairs of a nature unacceptable to the DeJameses, and GEICO denied liability under its policy, the DeJameses brought suit in the Circuit Court for Montgomery County against the Builder, alleging in their amended declaration breach of contract and fraud, and against GEICO, alleging breach of contract. The case came on for trial before a jury. The Builder's motion for a directed verdict, made at the end of the plaintiffs' case, was granted, relying on *Allen v. Wilkinson,* 250 Md. 395, 243 A. 2d 515 (1968),[1] and the absence of proof of fraud or fiduciary relationship. The case continued as to GEICO, and the jury returned a verdict against it for $4,155.80, on which judgment was entered.

Without challenging the amount of damages sustained by the DeJameses, GEICO grounds its appeal on three questions which we shall consider separately.

(i)

Was it error to permit the case to go to the jury, when the evidence showed that the wall did not collapse, but had merely cracked and bulged?

1. Which holds that in Maryland, there is no implied warranty in the sale of a completed house.

It is well settled that in interpreting insurance contracts, words are to be given their customary and normal meaning. *State Farm Mut. Auto Ins. Co. v. Treas,* 254 Md. 615, 255 A. 2d 296 (1969); *American Home Assurance Co. v. Erie Ins. Exchange,* 252 Md. 116, 248 A. 2d 887 (1969); *Offutt v. Liberty Mut. Ins. Co.,* 251 Md. 262, 247 A. 2d 272 (1968); *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 151, 235 A. 2d 556 (1967), and cases there cited. Absent ambiguity the construction of the contract remains within the province of the court and Maryland has not adopted the rule, followed in many jurisdictions, that an insurance policy is to be most strongly construed against the insurer, *American Cas. Co. v. Aetna Cas. & Surety Co.,* 251 Md. 677, 248 A. 2d 487 (1968); *Mateer v. Reliance Ins. Co.,* 247 Md. 643, 233 A. 2d 797 (1967); *Ebert v. Millers Mut. Fire Ins. Co.,* 220 Md. 602, 155 A. 2d 484 (1959). If the language of an insurance contract is ambiguous, however, construction is for the jury, *Ebert v. Millers Mut. Fire Ins. Co., supra,* 220 Md. at 610; *Eagle Star & British Dominions Ins. Co. v. Fleischman,* 175 Md. 433, 2 A. 2d 424 (1938); 22 Appleman, *Insurance Law and Practice* § 12853 (1947) at 7, and the ambiguity is to be resolved against the company which prepared the policy and in favor of the insured, *American Cas. Co. v. Aetna Cas. & Surety Co., supra,* 251 Md. at 684; *Allstate Ins. Co. v. Humphrey,* 246 Md. 492, 496, 229 A. 2d 70 (1967).

Horatio Allison, a structural engineer, who testified for the DeJameses, described the condition of the wall:

> "* * * We examined the inside and we found there was a horizontal crack at the first blocked house line [the first course of cinder blocks on the basement floor] and it extended, we estimated, two-thirds of the length of the rear wall; or at least at the point where the rupture was really discernible. Of course, you measure along the back, you can get many measurements about how much the wall had moved in, but we mea-

sured two inches in spots. And in one spot I was able to stick my hand all the way through the wall and feel the dirt on the other side of the wall."

In response to a question, Allison said that he felt no free water or excessive moisture in the earth behind the wall.

When asked to characterize the condition of the wall, Allison said it had "failed," explaining that this was an engineering term meaning "its condition was beyond any reasonable use," that it could "no longer usefully sustain a load," that "It certainly was unsafe," that "It would not be safe" if the wooden framework supporting the first floor joists and the shoring were removed, and that he "would have to recommend that the house not be occupied."

The only issue, of course, is what "collapse" means in the context of the insurance policy. If the meaning is clear, as GEICO contends, the case should not have gone to the jury, but if it is ambiguous, it was a question for the jury.

While it is quite apparent that but for the wooden supports, the wall might have fallen in, it did not. It might well be argued that the DeJameses were compelled under the policy provision relating to mitigation of damages to erect the supports and to keep them in place. GEICO would have us say that as a matter of law the case should have been taken from the jury because "collapse" means "to break down completely: fall apart in confused disorganization: crumble into insignificance or nothingness: * * * to fall or shrink together abruptly and completely: fall into a jumbled or flattened mass through the force of external pressure: * * * to cave in, fall in, or give away: undergo ruin or destruction by or as if by falling down: * * *," relying on the definition of "collapse" as a verb which is found in *Webster's Third International Dictionary* (1941) at 443, which the court made available to the jury with the concurrence of counsel.

But when used as a noun as it was in the GEICO policy, the same dictionary gives "collapse" a somewhat different connotation: "a breakdown in * * * strength * * *: complete sudden enervation: sudden loss of accustomed abilities: * * * breakdown: sudden failure: disintegration, ruin, destruction: * * * sudden loss of force * * *."

A possible explanation for this ambivalence can be found in the *Oxford English Dictionary* (1933). Until early in the eighteenth century, only the past participle of the verb, then used as an adjective, appeared in the English language,[2] generally in medical, religious or political context. In 1755 the verb form appeared in Samuel Johnson's *A Dictionary of the English Language.* In the 1773 edition, the last which Johnson revised, it was defined:

> "To collapse v.n. [collabor, collapsus Lat.] to fall together; to close so that one side touches the other. 'In consumptions and atrophy the liquids are exhausted, and the sides of the canals collapse; therefore the attrition is increased, and consequently the heat'—Arbuthnot on Diet [1732]".

Johnson identified the noun form as "collapsion," which he defined as "1. the act of closing or collapsing. 2. the state of vessels closed." *Id.* (1773, 1828 Stereotype Ed.) at 217.

Collapse appeared as a noun in the first part of the nineteenth century, and until a little more than a century ago, was found principally in the vocabulary of physiology and medicine. Although now in wider use, it has retained this flavor. *The Oxford Dictionary, supra,* defines "collapse" when used as a noun:

> "1. The action of collapsing or of failing or of suddenly shrinking together, breaking down,

---

2. Nathaniel Bailey, *An Universal Etymological English Dictionary* (1721).

giving way, etc., through external pressure or loss of rigidity or support; originally a term of physiology and medicine."

\* \* \*

"3. Failure, 'break-down' (of an institution, enterprise, established condition of things)." *Id.,* (Vol. 2 at 613-14).

When GEICO argues that the wall did not collapse but merely cracked and bulged, it would have us apply to the noun the more restrictive connotation usually ascribed to the verb. This is the root of the ambiguity which made the meaning of the word a jury question.

There is, however, respectable support for GEICO's contention. The case was thoroughly briefed by counsel, and during argument before us, both sides agreed that a numerical majority of American jurisdictions takes the strict view that "collapse," when used as a noun in insurance contracts, means a complete change in structure, an impairment of structural integrity, or a loss of distinctive character or usefulness as a building. *Higgins v. Connecticut Fire Ins. Co.,* 163 Colo. 292, 430 P. 2d 479 (1967) ; *Thornewell v. Indiana Lumbermens Mut. Ins. Co.,* 33 Wisc. 2d 344, 147 N.W.2d 317 (1967) (on facts remarkably similar to those before us) ; *Graffeo v. United States Fidelity & Guaranty Co.,* 20 A.D.2d 643, 246 N.Y.S.2d 258 *aff'd* 14 N.Y.2d 685, 249 N.Y.S.2d 882, 198 N.E.2d 911 (1964) ; *Kattelman v. Nat'l Union Fire Ins. Co.,* 415 Pa. 61, 202 A. 2d 66 (1964) ("collapse" was defined in the policy as meaning collapse of floors, walls or roofs, not resulting from subsidence, which is what occurred) ; *Employers Mut. Cas. Co. v. Nelson,* 361 S.W.2d 704 (Tex. 1962) ; *Niagara Fire Ins. Co. v. Curtsinger,* 361 S.W.2d 762 (Ky. 1962) (but whether damage was caused by landslide, a covered peril, was held to be a jury question) ; *Gage v. Union Mut. Fire Ins. Co.,* 122 Vt. 246, 169 A. 2d 29 (1961) ; *Central Mut. Ins. Co. v. Royal,* 269 Ala. 372, 113 So. 2d 680, 72 A.L.R.2d 1283 (1959) (probably the case most frequently cited in support of the view that

"collapse" means a "falling in," a "loss of shape," a "reduction to flattened form or rubble") ; *Weiss v. Home Ins. Co.,* 9 A.D.2d 598, 189 N.Y.S.2d 355 (1959) (crumbling of dock not a collapse) ; *Nugent v. General Ins. Co. of America,* 253 F. 2d 800 (8th Cir. 1958) (applying what the Eighth Circuit conceived to be the law of Missouri, in absence of a state decision) ; *Rubenstein v. Fireman's Fund Ins. Co.,* 339 Ill. App. 404, 90 N.E.2d 289 (1950) (insurance on chattels). See also, *Skelly v. Fidelity & Cas. Co.,* 313 Pa. 202, 169 A. 78 (1933) (life policy provided double indemnity if death was caused by building collapse; held not to be payable when decedent's death was caused by runaway coal car knocking down parts of walls) and *Sabella v. Wisler,* 59 Cal. 2d 21, 27 Cal. Reptr. 689, 377 P. 2d 889 (1963).

In our judgment, the minority view is the better reasoned and we propose to adopt it. Under these decisions, the ambiguity is resolved in favor of the insured by holding that any serious impairment of structural integrity is a collapse within the policy coverage. *Morton v. Great American Ins. Co.,* 77 N. M. 35, 419 P. 2d 239 (1966) ; *Rogers v. Maryland Cas. Co.,* 252 Iowa 1096, 109 N.W.2d 435 (1961) (facts virtually identical to those before us) ; *Anderson v. Indiana Lumbermens Mut. Ins. Co.,* 127 So. 2d 304 (Ct. of App. of La. 1961) (earthquake or other earth movements except landslide excluded from coverage; under doctrine of *ejusdem generis,* only abnormal movements excluded) ; *Allen v. Hartford Fire Ins. Co.,* 187 Kan. 728, 359 P. 2d 829 (1961) (another case with facts very similar to those in the present case) ; *Bradish v. British American Assurance Co.,* 9 Wisc. 2d 601, 101 N.W.2d 814 (1960) (distinguished in *Thornewell v. Indiana Lumbermens Mut. Ins. Co., supra,* which reached a contrary result, because *Bradish* involved a one story house, made uninhabitable by cracked wall) ; *Morton v. Travelers Indemnity Co.,* 171 Neb. 433, 106 N.W.2d 710 (1960) (basement wall buckled and cracked apparently due to pressure of melting snow) ; *Travelers Fire Ins. Co. v. Whaley,* 272 F. 2d 288 (10th Cir. 1959) (apply-

ing with remarkable foresight what the Tenth Circuit believed to be the law of Kansas) ; *Jenkins v. United States Fire Ins. Co.*, 185 Kan. 665, 347 P. 2d 417 (1959) (decided one month after *Travelers*).

As we see it, nowhere is the rationale of the minority view more aptly expressed than in *Travelers Fire Ins. Co. v. Whaley, supra*, 272 F. 2d at 290-91:

> "Did the parties intend there should be no coverage, and, therefore, no recoverable loss, unless there was a complete collapse and tumbling down of the foundation wall, so as to cause the superstructure to come crashing down in a heap of rubble; or did they mean the more realistic situation that if the foundation disintegrated by settling, pulling away or cracking so that it would no longer support the house, that there was a partial collapse?"
>
> \* \* \*
>
> "If the [insurer] intended that the word 'collapse' should be ascribed to the abstract dictionary definition it now contends for, it should have so stated. In the absence of such an expressed intent, we think it more realistic to define the terms in such a contract as connoting a sinking, bulging, pulling away of the wall so as to impair its function of supporting the superstructure and destroying its efficiency as a habitation."

We think there was an ambiguity in the policy and can find no reason why the case should not have gone to the jury.

#### (ii)

> Was it error to submit the case to the jury when the evidence showed that the wall had cracked and bulged as a result of the outside earth load against it and that earth movement and water in the earth (both of which were the

subject of specific exclusions in the policy) were contributing factors causing the damage?

Under our view of the case, this question is grounded on a misconception of both the policy exclusions and the nature of the testimony.

The first exclusion relieved GEICO of liability for loss from "any earth movement, including but not limited to earthquake, landslide, mud flow, earth sinking, rising or shifting." While the doctrine of *ejusdem generis* is usually relied on when a general term *follows* an enumeration of specifics, *Levy v. American Mut. Liability Ins. Co.*, 195 Md. 537, 73 A. 2d 892 (1950); *Anderson v. Indiana Lumbermens Mut. Ins. Co., supra,* 127 So. 2d 304, we are unwilling to say that it is wholly inapplicable here. We therefore construe "any earth movement" to mean unusual movement of the same nature and character as those specified. Consequently, the exclusion could not encompass damage occasioned by normal pressure or settling unless they were spelled out in the exclusionary clause. To hold otherwise would make virtually meaningless the coverage which was purportedly accorded by the policy, for it would be difficult to envision many other reasons why a house would collapse.

The second aspect of the appellant's question can be more quickly answered. The record is devoid of evidence that subsurface water played any role in the difficulty. The only relevant testimony is that of the witness Allison, who said he put his hand through the crack in the wall and found no free water or excessive moisture and that of the witness George H. Williams, a contractor, who had testified regarding the cost of repairs and admitted on cross-examination that it was his opinion that exterior pressure caused the wall to bulge, and conceded that dirt is heavier when wet than when dry.

### (iii)

Were the court's instructions to the jury misleading and confusing because the peril insured against was quoted to the jury, but the court

made no references to the special exclusions applicable thereto?

For the reasons stated in (ii), above, if it was error for the court to have omitted any reference to the exclusions from its charge, the omission could not have been prejudicial, because there was no evidence that earth movement or subsurface water as contemplated by the exclusions was a contributing factor.

The question must be answered in the negative, however, for an even more compelling reason. The colloquy which took place at the time the jury was instructed shows that there was no exception to the charge:

> "The Court: All right, gentlemen, now if you wish to put anything in the record—
>
> * * *
>
> "Mr. King [counsel for GEICO]: First of all, the Court has quoted the paragraph 14 [which included collapse among the perils insured against], but has failed to quote the special exclusions which are very pertinent.
> "The Court: You can read those; you can read those to the jury.
> "Mr. King: All right, as long as it is understood.
> "The Court: You can read any part of the policy—the entire policy is in evidence and you can use it in any way you wish.
> I would expect that you would.
> "Mr. King: Yes * * *."

In view of counsel's apparent acquiescence, nothing was preserved for appellate review. Maryland Rule 554 d, e; *Jones v. Federal Paper Board Co.*, 252 Md. 475, 489, 250 A. 2d 653 (1969); *Rockville Investment Corp. v. Rogan*, 246 Md. 482, 484, 229 A. 2d 76 (1967).

*Judgment affirmed, costs to be paid by appellant.*