LUMBERMENS MUTUAL
CASUALTY CO.

v.

ECCLES SECURITY AGENCY, INC.

Civ. No. Y–84–4455.

United States District Court,
D. Maryland.

April 17, 1986.

Mitchell Stevan, Baltimore, Md., and Steven R. Silberman, Baltimore, Md., for plaintiff.

Michael Bowen Mitchell, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Lumbermens Mutual Casualty Company ("Lumbermens") sued the Eccles Security Agency, Inc. ("Eccles") for insurance premiums due on a policy for workmen's compensation insurance issued in 1981, and renewed in 1982. Eccles filed several counterclaims. After hearing the plaintiff's case before a jury on March 12 and 13, the Court directed a verdict in favor of Lumbermens both as to its original claim and as to all of Eccles' counterclaims. The Court makes the following findings of fact and conclusions of law.

## FACTUAL BACKGROUND

In 1978, Eccles sought workmen's compensation coverage for the District of Columbia, but was unable to obtain it. On January 24, 1978, Eccles applied to the Mid-Atlantic Compensation Rating Bureau's ("MCRB") "assigned risk" program through the Cugle Insurance Agency of Ellicott City, Maryland. Iris J. Eccles, the Corporate Secretary for Eccles, signed the "assigned risk" application form. Plaintiff's Exhibit 1. The first line of that application stated: "The undersigned employer hereby applies for workmen's compensation insurance in *District of Columbia* [handwritten] and expressly represents that such insurance is sought in good faith."

Several lines lower on the MCRB application form, Eccles listed "Location of all work places by Town or City with Street and Number" as "National Arboretum, Wash., D.C." At the bottom of the first page of the application form was a blank asking for "Complete description of operations, by locations...." Eccles responded, "First contract is Armed Guard Service for the National Arboretum, Wash., D.C."

The MCRB accepted Eccles' application and assigned Eccles to Lumbermens. Lumbermens issued successive one-year contracts to Eccles in 1978, 1979, and 1980.

On February 2, 1981, Lumbermens wrote a letter to Eccles, which read:

Gentlemen:

Re: WORKERS' COMPENSATION IN-SURANCE

DEPOSIT PREMIUM: $2,271.00

POLICY: OCL 802 901

Please be advised that the renewal premium for your concern has been calculated to be $2,271.00. The renewal premium has been developed by the application of the rates and rules effective 4/1/80 to the latest codes and payrolls as shown on the expiring policy.

If you desire the renewal of this policy, please make payment to Lumbermens Mutual Casualty Company. In order to expedite handling, please return the second copy of this letter with your payment, in the enclosed self-addressed envelope. In order to avoid any lapse in coverage under your Workers' Compensation Insurance, payment must be received in our office no later than 3/10/81, the expiration date of the above captioned policy.

Plaintiff's Exhibit 2. The parties stipulated that "Eccles paid a deposit premium of $2,271.00 on or about March 1, 1981 for policy 1CL 802 901." Pre-Trial Order stipulation J.

On January 20, 1982, Lumbermens wrote a letter to Eccles, which read:

Gentlemen:

Re: WORKERS' COMPENSATION IN-SURANCE

DEPOSIT PREMIUM: $1,952.00

POLICY NO. 1CL 802 901

Please be advised that the renewal premium for your concern has been calculated to be $1,952.00. The renewal premium has been developed by the application of the rates and rules effective [unreadable] to the latest codes and payrolls as shown on the expiring policy. You may want to review this matter with your insurance executive.

If you desire the renewal of this policy, please make payment to Lumbermens Mutual Casualty Company. In order to expedite handling, please return the second copy of this letter with your payment, in the enclosed self-addressed envelope. In order to avoid any lapse in coverage under your Workers' Compensation Insurance, payment must be received in our office no later than 3/10/82, the expiration date of the above captioned policy.

Plaintiff's Exhibit 4. The parties stipulated that "Eccles paid a deposit premium of $1,952.00 or or about March 15, 1982 for policy 2CL 802 901." Pre-Trial Order stipulation K.

Later in 1982, Lumbermens learned for the first time that Eccles had contracts to guard other facilities in the District of Columbia in addition to the National Arboretum. Lumbermens asked to inspect and audit Eccles' payroll records for 1981 and 1982 in order to assess higher premiums reflecting that fact. (*See* condition number four, jacket page 2 of the insurance contracts between Eccles and Lumbermens). Eccles refused to allow an audit, and also refused to pay an estimated audit based on payroll estimates Lumbermens obtained from other sources. Lumbermens then filed this suit, amending its complaint for damages upwards when an audit revealed an even higher payroll than Lumbermens' outside information had indicated. Eccles argued that the language of the insurance contracts was ambiguous, and that it had intended to enter into insurance contracts covering its operations at the National Arboretum only.

The two insurance policies issued to Eccles and countersigned by Lumbermens were identical save for the dates of coverage. They contained two pages of "Declarations" applying to the specific policy, and three jacket pages of fine print setting out the "Insuring Agreements," "Exclusions," and "Conditions" of the contracts. Lumbermens filled out the information in the first two "Declarations" pages, then submitted the contracts to Eccles.

On both contracts submitted to Eccles, Lumbermens filled out Item one of the first Declarations page by identifying the Eccles Security Agency, Inc. as the insured and by filling in the address of Eccles' home office in Columbia, Maryland. Item one also asked for "Locations—All usual workplaces of the Insured at or from which Operations Covered by this Policy are conducted are located at the above Address unless otherwise stated herein." Lumbermens filled in "National Arboretum, Washington, D.C."

Section three of the Declarations provided, "Coverage A of this Policy applies to the Workers' Compensation and Occupational Disease Law of Each of the following states:" Lumbermens filled in that space with "District of Columbia."

Eccles argued that the insurance policy was ambiguous, because Section one of the Declarations could be read to mean that the insurance policy applied to Eccles' operations at the National Arboretum only, instead of to all of Eccles' operations in the District of Columbia.* That argument is untenable in light of the unambiguous terms of the rest of the contract.

To begin, on jacket page one of the contracts, Section I., under the heading "Coverage B—Employers' Liability," Lumbermens obligated itself return "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by

accident or disease, including death at any time resulting therefrom

"(a) sustained in the United States of America, its territories or possessions, or Canada by any employee of the insured arising out of and in the course of his employment by the insured either in operations in a state designated in Item 3 of the declarations or in operations necessary or incidental thereto."

Item 3 of the Declarations designated the District of Columbia as the area of coverage.

Further down on jacket page one, under the "Exclusions" section, the contracts provided:

"This policy does not apply:

(a) under coverages A and B to operations conducted at or from any workplace not described in Item 1 [which designated the National Arboretum] or 4 of the declarations if the insured has, under the workmen's compensation law, other insurance for such operations or is a qualified self-insurer therefor."

Under District of Columbia workmen's compensation law, applicable to the contracts (*see* below), Eccles could not obtain other insurance or become a qualified self-insurer without first canceling its insurance with Lumbermens, so the exclusion did not apply. Thus, the contract clearly covered "any workplace not described in Item 1...."

On jacket page three, condition number 16 provided: "Terms of Policy Conformed to Statute, Coverage A. Terms of this policy which are in conflict with the provisions of the workmen's compensation law are hereby amended to conform to such law." Declaration Item three designated District of Columbia workers' compensation law as the law applicable to the contract.

---

* Although irrelevant to the Court's resolution of the unambiguous terms of the contract, the Court is satisfied that Lumbermens kept filling in "National Arboretum" on each contract purely as a matter of housekeeping. This mistake was probably a direct result of Eccles' initial MCRB application, which listed the National Arboretum as its only workplace in the District of Columbia. There was uncontrovered evidence at trial that Lumbermens did not know about Eccles' contracts for guard services at other D.C. locations until 1982.

Prior to July 26, 1982, the D.C. Code incorporated the Longshoremen's and Harbor Worker's Compensation Act, 33 U.S.C. § 901, *et seq.*, as the Workers' Compensation Law of the District of Columbia. The United States Department of Labor administered the D.C. act, and assigned that function to the Office of Workmens' Compensation Programs.

Under 33 U.S.C. § 932(a)(1), incorporated in D.C. Code § 36–334 (1981 ed.), Eccles had the duty and obligation to obtain workers' compensation insurance for all of its employees in D.C., or to provide satisfactory proof of its ability to self-insure. Failure to insure subjected an employer to criminal liability.

Under Department of Labor regulations administering the Act, an employer "operating within any compensation district shall have such operations in that district insured by not more than one insurance carrier." 20 C.F.R. § 703.121. Washington, D.C. was compensation district number 40 for purposes of the law. 20 C.F.R. § 704.-201. In addition, if an employer wanted to self-insure, it had to present evidence that it was financially capable of doing so, obtain official approval, and agree "to immediately cancel any existing [insurance] policy as of the time of … [self-insurance] approval." 20 C.F.R. § 703.301. Under those regulations, once Lumbermens agreed to insure Eccles, it was bound to "full liability for the obligations under the Act of the employer." Eccles was liable under the Act for securing payment to all its D.C. employees of all compensation payable under the Act. 33 U.S.C. § 904(a), D.C.Code § 36–334(b).

## CONCLUSIONS OF LAW

The application of D.C. workers' compensation law rendered the two contracts completely unambiguous. Under that law, Eccles had a legal obligation to pay all workmen's compensation benefits due its D.C. employees. It had a legal obligation to obtain insurance, or to obtain official approval to self-insure. It could have only one insurer for the District of Columbia, and that insurer then became obligated to

cover all of Eccles' D.C. employees. Once Eccles accepted an insurance contract to cover all of its D.C. operations, by operation of the law incorporated into the contract it accepted insurance coverage for all its D.C. locations.

■ The construction of an unambiguous contract of insurance is a matter of law for the court. *See Owens-Illinois, Inc. v. Aetna Casualty and Surety Co.*, 597 F.Supp. 1515, 1519 (D.C.1984); *Interstate Fire and Casualty Co. v. Pacific Indemnity Co.*, 568 F.Supp. 633, 637 (D.Md.1983); *Government Employees Insurance v. De-James*, 256 Md. 717, 720, 261 A.2d 747 (1970). Because the Court found that the unambiguous terms of the contract indicated that the contract applied to all of Eccles' D.C. operations, the Court directed a verdict in favor of Lumbermens.

Defendants also argued that the letters informing Eccles that renewal premiums were due, and Eccles' payment of those renewal premiums, were ambiguous, creating an issue of fact for the jury as to whether contracts had been formed. The Court found the language of the letters unambiguous. After receiving letters clearly requesting payment of certain sums to renew insurance contracts, Eccles paid those exact amounts. It would be difficult to find a more classic example of offer and acceptance.

■ Eccles brought four different counterclaims, based on Lumbermens' referral of the delinquent Eccles account to Dun & Bradstreet for collection. In the first two counterclaims, Eccles alleged that Lumbermens published defamatory and slanderous statements to Dun & Bradstreet, "falsely accus[ing] Defendant/Counter-Plaintiff [Eccles] of owing debts, and failing to pay same." The Court has found as a matter of law that Eccles did owe those debts, and it is uncontroverted that Eccles "failed to pay same." Truth is a defense to slander and defamation actions. *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976). Because there was no issue of fact for the jury as to the truth of the state-

ments made by Lumbermens, the Court directed a verdict for Lumbermens on the first two counter-claims.

The third counter-claim incorporated the accusations of false statements of indebtedness, and alleged that those false statements constituted malicious interference with Eccles' right to pursue a lawful business. Although the Court has found no cases in Maryland recognizing such an action, the Court holds as a matter of law that the referral of a debt for collection cannot be malicious when the debt is properly due and owing. Thus, even if such an action exists in Maryland, it would be precluded by the Court's ruling that Eccles did in fact owe Lumbermens money. The Court directed a verdict for Lumbermens on this counterclaim as well.

Finally, Eccles alleged that Lumbermens negligently performed an audit of Eccles' books because the audit caused Eccles "to be wrongfully accused of being indebted to [Lumbermens] when in fact no indebtedness was owed." Eccles did not allege any other specific procedural improprieties in the audit; it is clear that the core of this claim was again directed to Eccles' contention that it did not owe any money. Because the Court found as a matter of law that Eccles did owe money, and because Eccles did not plead any other improprieties in the audit, the Court directed a verdict on this counterclaim.

DAMAGES

Although the liability of Eccles is clear as a matter of law, there is some question about Lumbermen's demand for damages. Lumbermens sought damages in the amount of $78,840, a figure they claimed was the result of an audit conducted by Daniel S. Fisher. Mr. Fisher was the only credible witness on the amount of damages, and his testimony was based on the worksheets he prepared at the time of the audit, Plaintiff's Exhibits 18 and 19. Exhibit 19 showed a deposit premium of $12,975 credited to Eccles. With that deposit premium subtracted from the premium due, Mr. Fisher's audit worksheet showed that Eccles owed $6,817 for the period March 10, 1982 to December 7, 1982. Exhibit 18 showed that Eccles owed $61,000 for the period March 10, 1981 to March 10, 1982.

The Court finds that the audit worksheets were the only credible evidence on damages, and that reasonable minds could not disagree that Lumbermens had failed to carry its burden of proof to show that the deposit premium figure in Exhibit 19 was incorrect. The Court will enter judgment for Lumbermens in the amount of $67,817, plus pre-judgment interest from September 27, 1982 and costs.