Alan I. KAY, et al.

v.

**UNITED PACIFIC INSURANCE COMPANY, et al.**

No. JFM–95–516.

United States District Court,
D. Maryland.

Oct. 27, 1995.

Mark Edward Futrovsky, Futrovsky & Weiner, Bethesda, MD, Harry P. Begier, Jr., Philadelphia, PA, for plaintiffs.

J. Paul Mullen, Kathryn Miller Goldman, Lord & Whip, Baltimore, MD, for defendants.

## MEMORANDUM

MOTZ, Chief Judge.

Alan I. Kay and Allen E. Rozansky, owners of a building known as the Tysons International Building, have brought this action against United Pacific Insurance Company ("United Pacific") and Reliance Insurance Company, seeking a declaratory judgment that defendants are obligated under an all-risk policy issued by United Pacific to pay the costs necessary to replace pre-fabricated brick panels on the exterior of the building. Bricks are beginning to fall out of the panels, and local government authorities have notified plaintiffs that unless they cure the problem immediately, the building will be closed. Because of the urgency of the matter, the case has been placed on an expedited track and both sides have now moved for summary judgment.

### I.

The summary judgment record has been established by reports and affidavits submitted by Allyn Kilsheimer, an independent consulting engineer retained by plaintiffs, and Therese T. McAllister, a senior civil engineer with FTI Corporation, an independent consulting engineering firm retained by defendants. Although there are some disagreements between them and although to some extent they paint their findings with a different gloss, Kilsheimer and McAllister agree upon most of the facts that are material to the insurance coverage dispute.

The exterior facade of the Tysons International Building is composed of pre-fabricated brick panels. The panels are connected to the concrete floor slabs by anchor bolts and plates. The panels are reinforced by 9–gauge joint reinforcement wires ("joint mesh") and ½ inch reinforcing steel ("rebar").

The purpose of these reinforcement mechanisms is to enable the bricks to resist tensions and stresses caused by gravity, wind, moisture and thermal expansion. Until very recently, the rebar has done its job; however, over the years the joint mesh has been inadequate to the task, particularly in preventing cracking caused by thermal changes.

As a result, cracks in the bricks have developed and moisture has seeped into them, causing a high percentage of them to crack further. Moreover, the moisture has begun to corrode the rebar, causing it to lose its required structural strength.[1] As the joint mesh continues to fail, as more cracking develops, as more moisture enters into the bricks and as more rebar corrodes, it is likely that more bricks will fall. If enough individual bricks fall from a given panel, there is a danger that the remainder of the bricks in the panel will eventually fall as well. Kilsheimer and McAllister agree that at least some of the panels must be replaced as soon as possible, and there appears to be no dispute between them that over time all of the panels will have to be replaced.

### II.

The policy issued by United Pacific provides coverage "for direct physical loss or damage" to the Tysons International Building "unless the ... cause of loss is listed under EXCLUSIONS...." Policy at 1. The pertinent exclusions may be succinctly described.

A. The policy expressly excludes from coverage loss, expense or damage caused by or resulting from cracking or expansion of walls. Policy at 3, Exclusion 2.1. Further, the policy expressly provides that "cracking" does not constitute a "collapse." Policy at 4, Exclusion 3.d. (last sentence). This is significant because coverage is provided for a "collapse" under certain circumstances as described below.

---

1. Kilsheimer asserts that moisture has entered the panels not only through the cracks but also by absorption through the bricks themselves. McAllister has not addressed the issue, and presumably Kilsheimer is correct since bricks are of porous material. However, this does not seem to

be a significant point of contention between the parties since plaintiffs have not suggested the amount of moisture absorbed through the bricks would alone be sufficient to cause corrosion of the rebar.

B. The policy expressly excludes from coverage loss, expense or damage caused by or resulting from "rust, corrosion, decay, fungus, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." Policy at 2, Exclusion 2.g. The policy goes on to provide, however, "if collapse results, we will pay for that resulting collapse to the extent not excluded under exclusion 3.d. below." *Id.*

C. All "collapses" are excluded unless they are caused by certain enumerated factors. One of those factors is "hidden decay." Thus, collapses caused by hidden decay are covered. Policy at 3, Exclusion 3.d.(12). Collapses are also covered if they are caused by "use of defective material or methods in construction, remodeling or renovation" but only "if the collapse occurs during the course of construction, remodeling or renovation." Policy at 3, Exclusion 3.d.(16). In that regard although the parties take different positions as to whether a "collapse" has occurred, it is undisputed that no collapse occurred during the course of construction, remodeling or renovation.

D. The policy excludes from coverage loss, expense or damage caused by or resulting from "faulty, inadequate or defective ... design, specifications, workmanship ... [or] construction" and from "materials used in ... construction." Policy at 4, Exclusion 8.c.(2) & (3).

### III.

Plaintiffs make three arguments as to why the cost of replacing the pre-fabricated brick panels at the Tysons International Building are covered losses.

### A.

■ First, plaintiffs assert that the loss of, or damage to, the rebar's required structural strength through corrosion is a covered loss that is not excluded by Exclusion 2.g. This is a somewhat difficult argument to make since Exclusion 2.g. expressly excludes loss or damage "caused by or resulting from corrosion."

Plaintiffs attempt to circumvent the exclusion by contending that "corrosion" does not always cause damage, e.g. corrosion film can develop, and that it is only harmless corrosion that Exclusion 2.g. is intended to exclude. The flaw in this argument is that the policy only provides coverage for "physical loss or damage," and there is no reason to exclude from coverage "harmless" corrosion.

To overcome this obstacle, plaintiffs go further and argue that "corrosion" has two meanings—the process of corrosion and the product of corrosion—and that Exclusion 2.g. is intended to cover only the latter, i.e., the corrosion itself, not an effect of the process of corrosion such as the loss of required structural strength. There are three fallacies in this argument. First, plaintiffs have not presented one shred of evidence to suggest that the parties did not intend that the word "corrosion" as used in Exclusion 2.g. was not intended to encompass both aspects of its commonly understood meaning. Second, although there are two definitions given to "corrosion" in Webster's Third International Dictionary, and although the second definition is "a product of corrosion," the first definition itself includes both of the meanings ascribed by plaintiffs: "the action, process or effect of corroding." Third, when Exclusion 2.g. is read in its entirety, i.e. beginning at the start of the exclusions section on page 1 rather than with the alphabetical heading g., it seems apparent that as a matter of grammatical structure corrosion is being used in its sense of a process, not in its sense of a completed state. Beginning at the beginning, the Exclusion states: "[w]e will not pay for loss, expense or damage ... caused by or resulting from ... corrosion." Thus read, that which is being excluded is precisely that which plaintiffs seek to include: losses and damages, such as the loss of required structural strength, that are the effects of corrosion.

### B.

Plaintiffs' second and third arguments are based upon the exception to the exclusion contained in Exclusion 2.g. and what I will denominate as the "unless proviso" of Exclusion 3.d.(12). Specifically, they contend that the deterioration of the panels constitutes a "collapse" caused by "rust, corrosion, ...

decay, deterioration, hidden or latent defect" and that coverage is therefore provided by the exception to the exclusion contained in Exclusion 2.g. Likewise, they assert that the deterioration of the panels is a "collapse" caused by "hidden decay" within the meaning of Exclusion 3.d.(12). Since both of these arguments are premised upon a "collapse" having occurred, I will address that question first.[2]

■ The parties agree that Maryland law applies to this question. They further agree that *Government Employees Ins. Co. v. De-James*, 256 Md. 717, 261 A.2d 747 (1970), establishes the governing test. Under *De-James* a building need not literally be falling down in order to be "collapsing." Instead, any serious impairment of structural integrity is a collapse within the policy coverage. 256 Md. at 724, 261 A.2d at 751.

■ I am persuaded that on the present record a factual issue is presented as to whether a collapse has occurred (or, more precisely, is in the process of occurring). Although the occasional falling of individual bricks from a facade—however dangerous that might be to a person standing underneath—may not alone impair the structural integrity of a building, structural integrity may well be impaired if there is an increasing danger (not curable by normal maintenance) of the failure of entire panels because of a combination of the loss of individual bricks, progressively corroding rebar and the continued failure of the joint mesh to perform its required function. Moreover, even if temporal "imminence" is a critical factor, as defendants suggest, the report of their own structural engineer reflects that at least some of the panels must be replaced as soon as possible. At the same time, on the present record it cannot be said the conditions at the Tysons Corner building are so critical that a collapse is in progress. In that regard, I note that in *DeJames* the Court of Appeals did not find that the weakening of the walls there involved constituted a collapse as a matter of law. Rather, it held

more narrowly that the question of collapse had properly been submitted to the jury.

## C.

I turn now to the question of whether assuming that a collapse has occurred, plaintiffs are entitled to coverage under the language of Exclusion 2.g. As I have previously discussed, that exclusion excludes from coverage loss, expense or damage caused by or resulting from "rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality and property that causes it to damage or destroy itself." The exclusion goes on to state that "[h]owever, if collapse results, we will pay for that resulting collapse to the extent not excluded under Exclusion 3.d. below." Plaintiffs read this exception to the exclusion to provide coverage for a collapse resulting from the excluded factors, i.e. "rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality or property that causes it to damage or destroy itself."

■ In making this argument plaintiffs ignore the last clause of the exception, i.e. that a collapse is covered "to the extent not excluded under Exclusion 3.d. below." That clause clarifies that the exception is not intended to provide coverage for any collapse resulting from any of the factors listed in the body of the exclusion but only from a collapse that (1) results from one of those factors, and (2) is not excluded under Exclusion 3.d. That exclusion excludes *all* collapses except those resulting from causes listed in its "unless proviso." Any uncertainty that would otherwise exist on the point is conclusively resolved by the long established Maryland rule that exceptions to exclusions do not extend coverage beyond that which is otherwise provided. See *Simkins Indus. v. Lexington Ins. Co.*, 42 Md.App. 396, 405, 401 A.2d 181, 186–87, *cert. denied*, 285 Md. 730 (1979).

---

**2.** If all that were involved here was the cracking of bricks, there clearly would be no "collapse." As plaintiffs acknowledge, the last sentence of Exclusion 3.d. expressly so provides. What

plaintiffs argue is that it is the dangerously deteriorating state of the panels in their entirety that constitute a collapse.

## D.

█ The next issue to be considered is whether the damage to the pre-fabricated panels is a "collapse ... caused by ... hidden decay" within the meaning of the "unless proviso" of Exclusion 3.d.(12). I have already discussed the question of whether the damage to the panels constitutes a "collapse." Therefore, what remains to be addressed is whether the damage is caused by "hidden decay."

At first glance it would seem that plaintiffs are entitled to prevail on the question. Although the cracking of the brick has been visible, it is not the cracking that per se is alleged to constitute the "collapse." Rather, the alleged "collapse" is the interior deterioration of the pre-fabricated panels, including the rebar's loss of required structural strength, and that deterioration has been "hidden" from outside view. Likewise, the immediate processes that has lead to this deterioration—moisture seeping through the cracks and consequent corrosion of the rebar—would seem to epitomize "decay."

Nevertheless, I conclude that when the policy is read as a whole and the "unless proviso" of Exclusion 3.d.(12) is considered in the context of the policy's other provisions, the processes that have lead to the deterioration of the panels may not constitute "hidden decay." In my judgment this turns upon whether the joint mesh—that both parties agree is the root cause of the problem—was defectively manufactured or if the design of the panels calling for the joint mesh was defective.[3]

Two provisions of the policy lead me to that conclusion: another "unless proviso" contained in Exclusion 3.d.(16) and Exclusion 8.c.(2) & (3). The first of these provisions affords coverage for a collapse caused by "use of defective material or methods in construction ..." but only "if the collapse occurs during the course of construction...." Clearly, the intent of this provision is to exclude coverage for a collapse caused by the use of defective material after construction has been completed.[4] Exclusion 8.c.(2) & (3) addresses the issue of defective material or defective design more generally, excluding coverage for any loss, expense or damage "caused by or resulting from ... faulty, inadequate or defective ... design, specifications, workmanship, repair, construction ... [or] ... materials used in ... construction."[5]

**3.** As noted in footnote 1, *supra*, Allyn Kilsheimer, the expert retained by plaintiffs, asserts that moisture has entered the panels not only through the cracks but also by absorption through the bricks themselves. If plaintiffs ultimately can establish that this moisture alone could have caused the deterioration of the panels without regard to any defect in the joint mesh, they would be entitled to coverage under the "unless provision" of Exclusion 3.d.(12). That, however, does not appear to be their position.

**4.** There is no "unless proviso" for any collapse caused by defective design. Therefore, it appears that even if a collapse caused by defective design occurred during the course of construction, there would be no coverage. It follows *a fortiori* that there is no coverage for a collapse caused by defective design after construction has been completed.

**5.** Plaintiffs assert that the root cause of the deterioration of the panels is not the joint mesh but the change in thermal conditions that cause the expansion of the bricks that the joint mesh was inadequate to handle. Thus, they seek to find coverage under Exclusion 8.a. that excludes from coverage only loss, expense or damage caused by or resulting from weather conditions that contribute to certain causes or events listed in an earlier exclusion. Since the failure of the joint mesh is not the type of cause or event listed in that earlier exclusion and since thermal change contributed to that failure, plaintiffs argue that the failure of the joint mesh is covered. This argument proves far too much. Buildings do not stand in sterile environments. Every day they are surrounded by weather conditions that operate upon them. If plaintiffs' "first cause" theory were accepted, the express exclusions for inadequate design, workmanship, materials and the like would be rendered nugatory. Indeed, one of the things that renders design, workmanship or materials defective is their inability to withstand normal weather conditions. In that connection plaintiffs have not suggested that the Tysons International Building has been subjected to any abnormal conditions that cause the joint mesh to fail.

It should be further noted that plaintiffs' reading of Exclusion 8.a. is inconsistent with Exclusion 2.1. that, *inter alia*, excludes coverage for loss, expense or damage caused by or resulting from "expansion of ... walls." The mechanism leading to the failure of the joint mesh was not simply the change in thermal conditions but the expansion of the bricks that the thermal changes caused.

The case of *Essex House v. St. Paul Fire & Marine, Ins. Co.*, 404 F.Supp. 978 (S.D.Ohio 1975) is very much on point. There, on facts somewhat similar to those presented here, the court found the insurer liable under an all-risk policy despite the insurer's ·contention that negligence in the design and construction of the building contributed to the failure of the building's face brick. However, in reaching that result the court noted as follows:

> Had the parties in our case intended to exclude negligent workmanship and faulty design (or, for that matter, loss due to high temperatures), it would have been a simple matter for the insurer to have included express terms more consistent with that result.

Id. at 993. Here, Exclusion 8.c.(2) & (3) could not have been more clear and explicit in excluding coverage for loss, expense or damage caused by or resulting from faulty, inadequate or defective design, workmanship, construction and materials.

## IV.

In summary, my rulings are as follows:

1. Exclusion 2.g. excludes coverage for plaintiff's direct claims for corrosion damage to the rebar.

2. Whether a "collapse" has occurred is a question of fact inappropriate for resolution by summary judgment.

3. Assuming that a collapse has occurred, plaintiffs may not recover under the sentence beginning "however" in Exclusion 2.g. because that sentence is not intended to extend coverage beyond that provided by the "unless provisos" of Exclusion 3.d.

4. Assuming that a collapse has occurred, plaintiffs may not recover under the "unless proviso" of Exclusion 3.d.(12) related to "hidden decay" if the joint mesh was defectively manufactured or if the design calling for the joint mesh was defective.

Defendants argue that the summary judgment record is sufficient to establish that the joint mesh is "defective" within the meaning of the policy. They rely upon the finding of Therese McAllister (that is not disputed by Allyn Kilsheimer) that the joint mesh was inadequate to the task of protecting the bricks from thermal expansion. I am not satisfied, however, that McAllister's finding alone establishes any "defect." Defendants bear the burden of establishing the applicability of any exclusion contained in the policy, and they have not presented any direct evidence to suggest that the joint mesh was defectively manufactured or that the panels were defectively designed. Nor can it necessarily be inferred from deterioration of the pre-fabricated panels that there must have been either a manufacturing defect or a design defect. The Tysons International Building was built in 1980 and the first cracks in the brick facade were first noted in 1993. Although a building certainly should be built to stand longer than thirteen years, a host of issues, including ones relating to the "state of the art," are always raised in construction/design litigation. As to such issues the present record is absolutely silent.

For these reasons I find that neither party is entitled to summary judgment on the present record and will enter an order to that effect. I will, however, keep the case on an expedited track so that a full factual record can be developed as to the remaining questions.

## ORDER

For the reasons stated in the memorandum entered herewith, it is this 27th day of October 1995

ORDERED

1. Plaintiffs' motion for partial summary judgment is denied; and

2. Defendants' motion for summary judgment is denied.