DECISION
This case is before this Court by stipulation of the parties to the relevant facts for a decision on the merits. The stipulated facts are as follows.
On November 13, 1989, the City of Warwick Building Inspector's Office issued Stuart and June Mundy (hereinafter plaintiffs) a building permit for the construction of a residential dwelling at 54 Kenwood Street, Warwick, Rhode Island. Daniel Dyer (hereinafter Dyer) was one of several subcontractors the plaintiffs hired to perform various functions. On April 12, 1990, Dyer entered into a building contract with the plaintiffs to perform certain carpentry work required by prepared drawings and specifications. In the contract, the plaintiffs agreed to provide materials and Dyer agreed to supply the labor for the work he agreed to do. The contracted work included framing, siding, deck, roofing, windows, and exterior doors. Dyer started working on plaintiffs' property on April 12, 1990.
Sometime before construction started, plaintiffs contacted Andrew Palazzo, of A. Palazzo Associates in the Outward Insurance agency, inquiring as to the availability and costs of insurance to provide coverage for a home under construction. An expensive builders risk policy was discussed. Mr. Palazzo also advised plaintiffs that a homeowners policy could be purchased when the construction was completed to the extent that plaintiffs would be able to move into their new home within ninety days.
On May 8, 1990, pursuant to an application executed by Stuart Mundy earlier that day, defendant Narragansett Bay Insurance Company (hereinafter Narragansett Bay) issued a binder for a homeowners policy to cover the dwelling located at 54 Kenwood Street, Warwick, Rhode Island. The policy period covered May 9, 1990 through May 9, 1991. As of May 8, 1990, Dyer had completed the framing of the exterior house, had covered the outside of the house with Tyvek paper, and was in the process of shingling the roof. He had also framed the upper portion of the interior of the house, installed the center beam and trusses, and had done some of the interior framing.
On May 24, 1990, June Mundy was informed by a worker who was measuring the layout for the kitchen cabinets, that there was a problem because the walls were off. Later that day, Mrs. Mundy asked her father, who had a background in general contracting, to look at the house. Mrs. Mundy's father told her that there were a lot of things wrong and suggested she call the architect who prepared the plans for the house.
Mrs. Mundy called the architect and asked that he come over the next morning. On May 25, 1990, the architect suggested that Mrs. Mundy not let Dyer do any more work on the house. Dyer was fired on May 25, 1990.
On July 9, 1990, the architect sent plaintiffs a letter indicating that in his opinion the structural integrity of the building was severely compromised and, as such, the building was not safe for human habitation. The architect said that since his initial inspections there was further evidence of continuing structural distress. He added that this distress was most noticeable in the exterior walls where the plywood was beginning to bow. The architect further indicated that there was continuing separation of the laminated beams which provided the center support for the dwelling.
Subsequently, on August 14, 1990, plaintiffs received a letter from the City of Warwick Building Inspector's Department (hereinafter the inspector) stating that it had inspected the dwelling located at 54 Kenwood Street on June 26, July 21, and August 10, 1990. In his letter, the inspector indicated in part that the August inspection revealed that severe settling and racking had occurred throughout the house. The inspector concluded that this movement had resulted in a very unsafe condition. The inspector also indicated that he had reviewed the reports of others, including the architect. Finally, the inspector concluded that, based on all of the information, the structure was unfit for human habitation and posed a risk to the health, safety, and welfare of the public. Accordingly, the inspector ordered plaintiffs to demolish the structure immediately. The property was disassembled and dismantled shortly thereafter.
I
Plaintiffs contend that the "collapse clause" contained in the homeowners policy issued to them by defendant, Narragansett Bay, is ambiguous. Because the clause is ambiguous, plaintiffs argue, it should be strictly interpreted against defendant. Thus, plaintiffs conclude that the "collapse clause" covers the loss they incurred through the defective construction and subsequent demolition of their home. Alternatively, defendant, Narragansett Bay, asserts that the "collapse clause" is unambiguous and plaintiffs' loss is not covered. Accordingly, this Court must resolve the controversy by determining whether or not the "collapse clause" is ambiguous.
The homeowners policy provision at issue states, in pertinent part:
 "Collapse. We insure for direct physical loss to covered property involving collapse of a building or to any part of a building caused by one or more of the following:
 . . .
 f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.
 . . .
 Collapse does not include settling, cracking, bulging or expansion."
"It is well-settled law in Rhode Island that when the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end." Pacitti v. Nationwide Mut. Ins. Co.,626 A.2d 1284, 1286 (R.I. 1993) (citing Amica Mut. Ins. Co. v.Streicker, 583 A.2d 550, 551 (R.I. 1990)). The collapse provision in plaintiffs' policy clearly states that the defendant does not cover collapse due to "settling, cracking, bulging or expansion." Thus, the coverage under the collapse provision is explicitly qualified to exclude the aforementioned clauses. This Court is of the opinion that, when read in conjunction with this qualifying language, the term "collapse" is unambiguous and must be given its plain and ordinary meaning.
For plaintiffs to be able to recover for their loss, the loss to the property must have been due to a falling in, loss of shape, or reduction to flattened form or rubble of the building.Gage v. Union Mut. Fire Ins. Co., 169 A.2d 29 (Vt. 1961). Both parties agree that plaintiffs' home was poorly constructed. The parties also agree that because of the danger posed by the poor construction, the home was demolished. However, since the destruction of plaintiffs' home was directly caused by the demolition and not by any "collapse", as that term has been interpreted by this Court, the loss is not covered.
To avoid this result, plaintiffs attempt to distinguish themselves from cases in other jurisdictions wherein the term "collapse" was found to be unambiguous. Plaintiffs emphasize that their home did not collapse due to settling or cracking but because of poor workmanship and constructions. Thus, plaintiffs appear to be arguing that the term "collapse" is subject to two different meanings dependent upon the circumstances. In order to be covered under the "collapse clause" settling and cracking generally must result in a falling down or reduction to rubble. But when poor construction and workmanship combine to cause
settling and cracking, a building does not have to fall down in order to be covered. This distinction is tenuous and misplaced. As used in a policy of the sort at issue in the present case, the term "collapse" can have only one meaning throughout. When read in conjunction with the explicit policy exclusions, "collapse" is unambiguous and must be given "its plain, ordinary and usual meaning." Jennings v. Midville Golf Club. Inc., 636 A.2d 707, 708 (R.I. 1994) (citing Malo v. Aetna Casualty and Surety Co.,459 A.2d 954 956 (R.I. 1983)). Accordingly, before it can be covered under the "collapse clause" a building must fall down, be reduced to rubble, or cave in.
II
Insurance policy collapse provisions like the one contained in plaintiffs' policy have long been the subject of debate and disagreement. See Annotation, What Constitutes "Collapse of aBuilding Within Coverage of Property Insurance Policy, 71 A.L.R.3d 1072 (1976). Generally speaking, there are two types of collapse provisions. Id. The collapse provisions in some insurance policies insure against the "collapse of a building or any part thereof" without further definition or exclusion. Other policies contain collapse provisions more like the one at issue in this case. These clauses insure against loss caused by "collapse" but specifically exclude loss from settling, cracking or bulging.
Over the years, judicial interpretation of these clauses has become sharply divided. Id; See, e.g., Jenkins v. United StatesFire Ins. Co., 185 Kan. 665, 347 P.2d 417 (1959). In interpreting these two types of clauses, courts have split as to the ambiguity of the term "collapse." As to the first type of collapse provision, some courts have taken the position that, when used without definition by qualification or exclusion, the term "collapse" is unambiguous, denoting a falling in, loss of shape, or reduction to flattened form or rubble. Olmstead v. LumbermensMut. Ins. Co., 22 Ohio St.2d 212, 259 N.E.2d 123 (1970); Higginsv. Connecticut Fire Ins. Co., 163 Colo. 292, 430 P.2d 479 (1967);Central Mut. Ins. Co. v. Royal, 269 Ala. 372, 113 So.2d 680
(1959).
On the other hand, some courts have held that, when used without definition by qualification or exclusion, the term "collapse" is ambiguous. Morton v. Great American Ins. Co., 77 N.M. 35, 419 P.2d 239 (1966); Anderson v. Indiana Lumbermens Mut. Ins.Co., 127 So.2d 304 (La. App. 1961); Jenkins v. United States FireIns. Co., 185 Kan. 665, 347 P.2d 417 (1959). These cases interpreted the term "collapse" broadly as encompassing the settling, cracking, bulging, or breaking down of part or all of the insured building when these conditions lead to the material impairment of the basic structure or substantial integrity of the building or any part thereof.
Further, courts have diverged along similar grounds when interpreting the second type of collapse provision, insuring against loss by "collapse" subject to certain exclusions, i.e., settling, bulging or expansion. Some courts have found that this type of collapse clause is ambiguous and provides coverage for settling, cracking, and similar conditions which materially impair the basic structure or substantial integrity of part or all of the insured building but do not result in a falling down or reduction to rubble. Government Employees Ins. Co. v. DeJames,256 Md. 717, 261 A.2d 747 (1970); Samuel v. Sewerage WaterBoard, 181 So.2d 243 (La. App. 1965), cert. denied 248 La. 1029,193 So.2d 651. Plaintiffs recommend this Court follow this interpretation of the collapse provision.
In finding that the term "collapse" is unambiguous, this Court aligns itself with several other courts that have interpreted similar collapse provisions to be unambiguous when read in conjunction with the explicit policy language excluding collapse coverage due to settling, cracking, bulging or expansion. See, e.g., Williams v. State Farm Fire Casualty Co.,514 S.W.2d 856 (Mo. App. 1974); Krug v. Millers' Mut. Ins.Assoc., 209 Kan. 111, 495 P.2d 949 (1972); Employers Mut.Casualty Co. v. Nelson, 361 S.W.2d 704 (Tex. 1962). These courts have routinely applied the dictionary definition of the term "collapse" and required that a building must fall down or be reduced to rubble to be covered under a collapse provision.
III
At the heart of this case lay two seemingly conflicting rules of contract construction. The first rule, asserted by plaintiffs, would require that "when terms of [an insurance] policy are subject to more than one reasonable interpretation, . . . that language should be construed strictly against the insurance company." Mullins v. Federal Dairy Co.,568 A.2d 759, 762 (R.I. 199). Plaintiffs contend that the term "collapse" is subject to "more than one reasonable interpretation" as demonstrated by the division among courts that have faced this issue. Plaintiffs argue that this division provides sufficient reason for this Court to hold that, as used in the policy provision at issue, the term "collapse" is ambiguous and should not be read to bar plaintiffs claim. This Court refuses to adopt this interpretation.
Under the second rule of construction, a court is not required to "stretch its imagination in order to read ambiguity into a policy where none is present." Id. This Court refuses to take the issue out of context and has instead read the insurance policy as a whole to glean the true meaning of the term "collapse" and the coverage provided under the "collapse clause." When considered from this perspective, the term "collapse" is unambiguous as it is qualified by the exclusion of loss due to "settling, cracking, bulging or expansion."
Accordingly, to be covered under defendant, Narragansett Bay's, insurance policy loss to a building must be due to a falling down, loss of shape, or reduction to flattened form or rubble.
After due consideration of the memoranda offered by both parties, this Court finds that the term "collapse" is unambiguous. Thus, the "collapse clause" contained in defendant's insurance policy does not cover plaintiffs loss caused by the defective construction and subsequent intentional demolition of plaintiffs' home.
Counsel for defendant, Narragansett Bay, shall submit a judgment consistent with this decision.