JOHN L. MORTON ET AL., APPELLEES AND CROSS-APPELLANTS,
v. TRAVELERS INDEMNITY COMPANY, A CORPORATION, ET
AL., APPELLANTS AND CROSS-APPELLEES.
106 N. W. 2d 710

Filed December 16, 1960. No. 34820.

*Cline, Williams, Wright & Johnson* and *Charles E. Wright,* for appellants.

*Crosby, Pansing, Guenzel & Binning* and *Donn E. Davis,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, John L. Morton and Mary Ellen Morton, who jointly owned a dwelling house property at 2702 Bradfield Drive in Lincoln, brought this action against defendant, Travelers Indemnity Company and others, seeking to recover under the provisions of a "Comprehensive Dwelling Policy" of insurance covering the

dwelling, which policy defendant company had duly executed and delivered to plaintiffs on or about January 1, 1957, upon payment of $88.80 as the first annual premium. Among other things, such policy insured plaintiffs to the extent of but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after loss against all direct loss by fire, lightning, windstorm, and hail perils and other multiple enumerated scheduled risks.

Among other things, the policy agreed to pay for direct loss by: "9. Collapse: Loss by collapse shall mean only the collapse of the building or any part thereof." Also, under the terms of the policy, the homeowner had a contractual duty to make reasonable repairs confined solely to protection of the property from further damage, and keep an accurate record of such repair expenditures. It further provided that costs of any such repairs directly attributable to any peril insured against should be included in determining the amount of loss.

In that connection, plaintiffs attached a copy of the policy to their petition, and, relying upon its provisions aforesaid, sought to recover from defendant the cost of repairing the basement walls and other damages to their dwelling as direct loss when sometime between about March 23, 1957, and March 28, 1957, a part of their dwelling's concrete basement walls allegedly collapsed and damaged other parts of the house, and imposed serious and immediate danger that the dwelling would further collapse. Original defendants other than Travelers Indemnity Company were dismissed out of the action and are not here involved.

Defendant's answer admitted that plaintiffs were joint owners of the property, and that defendant issued the policy of insurance thereon for a risk entitled therein "collapse," as alleged. Defendant then specifically denied that plaintiffs suffered any "collapse" loss as de-

scribed in the policy, and denied generally except as expressly admitted. It was stipulated that plaintiffs' reply in the nature of a general denial should be considered as filed.

Upon trial to a jury, plaintiffs adduced evidence in their behalf and rested. Thereupon, defendant moved for a dismissal of plaintiffs' petition and cause of action, or in the alternative to direct a verdict in favor of defendant substantially upon the grounds that plaintiffs' evidence was insufficient to support and establish any cause of action under the "collapse" provisions of the policy. Such motion was overruled and defendant rested without adducing any evidence in its behalf.

Upon submission to the jury, it returned a verdict in favor of plaintiffs and against defendant for $1,500, and judgment was rendered accordingly. Thereafter, plaintiffs' motion for an allowance of attorneys' fees, under the provisions of section 44-381, R. R. S. 1943, and defendant's motion for judgment notwithstanding the verdict or in the alternative for new trial, were overruled. Thereupon, defendant appealed, assigning and arguing that the trial court erred as follows: (1) In overruling defendant's motion to dismiss and failing to render judgment for defendant pursuant to its motions; (2) in the giving of instruction No. 5; (3) in failing to instruct on proximate cause; (4) in admitting exhibits Nos. 2 to 13, inclusive; and (5) in failing to hold that the verdict and judgment were excessive and not supported by the evidence. We do not sustain the assignments.

On the other hand, plaintiffs cross-appealed, assigning and arguing that the trial court erred in overruling their motion for an allowance of attorneys' fees. We do not sustain their assignment.

As recently as Edgar v. Omaha Public Power Dist., 166 Neb. 452, 89 N. W. 2d 238, we reaffirmed that: "A motion for directed verdict or for judgment notwithstanding the verdict must, for the purpose of decision

thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence."

Also, in Snyder v. Farmers Irr. Dist., 157 Neb. 771, 61 N. W. 2d 557, we reaffirmed that: "Where different minds may draw different inferences or conclusions from the facts proved, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury to be determined; but, where the evidence is undisputed, and but one reasonable inference can be drawn from the facts, the question is one of law for the court."

As summarized, plaintiffs' evidence discloses substantially the following: Plaintiffs purchased the property known as 2702 Bradfield Drive shortly prior to January 1, 1957, when they purchased the policy here involved from defendant and paid the $88.80 premium therefor. The policy's multiple provisions appear in the original policy which was offered and received in evidence. Plaintiffs moved into the house on February 1, 1957, with their two sons who were respectively 5 and 3 years old. The boys played almost daily in the basement, and Mrs. Morton was in the basement working and looking after them several times a day. The house was about 30 years old when purchased but it was in good condition. It had recently been redecorated and there were no visible warps or cracks in the walls on the first and second floors; or a drop in one end of the house; or cracks; or bowing, bulging, or caving in of the north, south, and west walls of the basement when plaintiffs purchased the house or when they left Lincoln for a trip to Chicago on March 23, 1957. In that connection, Mrs. Morton had been working in the basement until 2 a. m. on Saturday morning, March 23, 1957, in order to prepare for that trip, but the house was then

intact. Thus, about 8 or 9 a.m. on March 23, 1957, plaintiffs both left for the trip and returned therefrom on the evening of Thursday, March 28, 1957. While absent from Lincoln, there had been a heavy snow which was rapidly melting upon their return.

When they returned that evening, Mr. Morton went down into the basement to see whether the rapidly melting snow had leaked into the basement. It had not done so. However, he observed that the north wall had a slight water stain on it and that the wall was bulging and caving in his direction, as was also the west wall. The same condition existed on the south wall, only more so. That wall was coming into or buckling into the center interior of the basement. That wall was cracked from almost the upper righthand corner to almost the lower lefthand corner, and some of the concrete blocks had broken. That wall bulged inward about 4 to 6 inches and had the appearance of immediately falling into the basement. The southwest portion of the south wall was no longer intact with the house, and there was a hole in between the blocks where they had broken open and the mortar had come out onto the basement floor, which it continued to do thereafter. The floor in the southwest corner of the basement was cracked and raised up some. The basement walls remained standing with the bulges and cracks in them, but they were not intact. Mr. Morton testified that he did not see any of the wall blocks lying out on the basement floor as a result of what you would call a collapse, but it looked like it could happen any minute. He did not know what the term "collapse" meant as used in the policy, but his opinion was that "collapse" was where something falls completely down, and in this situation it hadn't fallen completely down, but from the way it bulged and leaned it looked like total collapse could happen any time. The east wall was straight and looked like it had been repaired on some previous occasion.

Mrs. Morton made comparable observations, except that by measuring from an electric pipe on the south wall she thought it was bowed in from 9 to 10 inches.

A graduate consulting engineer, who specialized in soil, asphalt, and concrete problems, casually inspected the basement of plaintiffs' home on or about April 1, 1957, at the request of an agent for defendant. He testified that the north, west, and south walls all had a degree of inward bow or buckling, with the south wall being more pronounced and critical. He estimated that the convex bulging was 2 or 3 inches from a perpendicular line distributed fairly well over the entire south wall, and that same was buckling rather critically. Such wall was cracked and opened up between some blocks where they had been previously filled and painted, and that the east wall appeared to be relatively new. He advised that the walls needed to be replaced or repaired by being braced or otherwise supported, because they could completely collapse in the foreseeable future. He testified that the north and south walls would be carrying the predominant load of the house, and if they fell in, the house would follow them down and the floor base would collapse in the areas adjacent to the walls, and generally that the house and wall would go down or topple into the basement, but that no part of the house had yet collapsed into the basement. He testified that the condition so found was caused by previous relatively heavy precipitation and exterior pressure therefrom. He only inspected the basement walls.

Another witness, who examined and fully inspected the basement walls in April 1957, had been a contractor in Lincoln for 15 years, specializing in concrete masonry excavation work, and replacement of basement walls and foundations. He found considerable bulging and a vertical crack in the south and north walls, with less in the west wall. His opinion was that such basement walls had in fact a loss of firm connecting rigidity or support; that they had lost any holding power; that

after becoming overbalanced, they had lost their balance; that some of the blocks themselves were cracked in two, as distinguished from cracks in between the joints; and that the cracked blocks had very little holding power against outer pressure. He testified that evidently the east wall had been previously relaid with the same type of material. His opinion was that the condition of the north, west, and south walls was such that they could not have been repaired and made good or permanent without removal and reconstruction. He actually supervised their removal and replacement with newly constructed footings and walls. In doing so, timbers were placed up against the floor joists of the house and supported by jacks along the walls to hold the joists into position, then the walls were torn out and new 10-inch walls were laid back on the footings up under the house in such manner as to firm its support on the walls. The undisputed evidence is that he was paid $1,250 by the plaintiffs for such work, and that such amount was a fair and reasonable charge for the work and materials. In that connection, defendant argues that if plaintiffs are entitled to recover, the verdict and judgment should be reduced to $1,250 because, for want of sufficient evidence, plaintiffs could recover nothing for claimed damages and costs for repairing other parts of the house allegedly resulting from the damaged condition of the basement walls.

With respect to the upstairs portion of the house, plaintiffs testified that the house had been recently decorated and that prior to their trip to Chicago there were no visible cracks in or damage to the upstairs walls. However, upon their return from Chicago, they found cracks in the walls and corners that warped the paper, and other wall damage, to wit: In the south bedroom; over the window sills in the living room; in the bathroom; in the back hall and entryway; and in the den, hall, and stairway. The mantle on the south side of the fireplace could be seen to be warped and slanted

down toward the south, out of level; and the back entry door and walls were warped and pushed so clearly out of line that they had to change the lock on the door in order to keep it shut. In that connection, the consulting engineer who had inspected the basement walls at defendant's request, testified that the house walls would go downward if the north or south wall moved down as much as one inch. Photographs appearing in this record as exhibits Nos. 2 to 13, inclusive, graphically reflect the aforesaid condition of the upstairs on March 28, 1957, and November 10, 1959, and, contrary to defendant's contention, they were properly admitted in evidence, which disposes of defendant's fourth assignment of error.

Contrary to defendant's contention, the evidence was sufficient to support a contention that the upstair damages aforesaid directly resulted from the sudden and unusual condition and damages to the basement walls. No other inference could reasonably be drawn from the evidence.

In that connection, the parties stipulated, subject to objection by defendant, that if a named painter and paperhanger were called as a witness, he would testify that he had examined plaintiffs' house on or about April 8, 1957, and again on November 10, 1959, at which times it was in about the same condition, and that in his opinion the fair and reasonable value of repairing the cracks and repapering the upstairs would be respectively as follows: The living room, $150.50; the hall and stairway, $230.50; the lower bathroom, $27.50; the southwest bedroom, $29.50; the back hall, $75.00; and the den, $70.55. The total thereof was $583.55. Defendant's objection to such evidence, as incompetent, irrelevant, immaterial, and not tending to prove or disprove any issue in this case, was overruled, and from what has been heretofore and will be hereinafter pointed out, we believe that ruling was proper. It will be noted that the verdict of the jury was for only $1,500, and $1,250 thereof

was undisputed, so evidently the jury awarded plaintiffs only $250 for the upstairs repairs, and plaintiffs make no complaint thereof.

In the light of the foregoing, the first and primary question is the construction and application of the provision of the policy providing for direct loss insured against by "the collapse of the building or any part thereof." In substance, defendant argues from several text definitions of the term "collapse" that "the collapse of the building or any part thereof" means to fall together, as a building, through the falling of its sides; to fall into an irregular mass or a flattened form through loss of rigidity or support; to fall or cave in; to break down or fall; or to come to nothing. In that connection, defendant contends that the word "collapse" as so defined is unambiguous; that its meaning is fixed and understood by all, therefore plaintiffs' basement walls did not collapse; that the upstairs was not directly damaged by collapse of such walls within the terms of the policy; and that plaintiffs could not recover thereon because to permit it would create a new contract between the parties.

On the other hand, plaintiffs contend that this court is not faced with the problem of defining only the word "collapse" as argued by defendant, but rather with what the parties to the insurance contract meant by the clause "collapse of the building or any part thereof"; that is, what a reasonable person in the position of insured would have understood such clause to mean. Plaintiffs argued that a reasonable insurance purchaser would understand the coverage for direct loss by "collapse of the building or any part thereof" to mean a sudden or unusual shrinking, settling, or falling in of the building or any part thereof, or the loss of firm support, rigidity, or connection with other parts, but that the basement walls would not need to have actually fallen down, as stated by instruction No. 5 given by the trial court when considered in connection with

all other instructions given and the factual situation presented. Defendant made no request for a more specific instruction.

In that connection, it is generally the rule that: "Instructions to a jury must be considered together, so that they may be properly understood, and, if as a whole they fairly state the law applicable to the evidence when so construed, error cannot be predicated on the giving thereof.

"Instructions must be considered and construed together, and if they are not sufficiently specific in some respects, it is the duty of counsel to offer requests for instructions that will supply the omission, and, unless this is done, the judgment will not ordinarily be reversed for such defects." Coyle v. Stopak, 165 Neb. 594, 86 N. W. 2d 758.

Also, Shiman Bros. & Co. v. Nebraska Nat. Hotel Co., 146 Neb. 47, 18 N. W. 2d 551, held that: "Where instructions as a whole correctly state the law applicable to the controverted issues, the verdict of the jury, if supported by sufficient evidence, will not be set aside because particular instructions, considered separately, contain mere informalities or omissions which are not misleading or confusing."

As hereinafter observed, we agree with plaintiffs' contention; therefore the trial court did not err in giving instruction No. 5, or in failing to define proximate cause. With respect to proximate cause or direct loss, numerous instructions given by the trial court relating to plaintiffs' loss required that it be a "direct loss," or "direct result," or "directly attributable," or a "directly causing," or "causing" loss by collapse of the building or any part thereof, as provided in the policy. Such quoted words are plain and clear language, generally well understood. Also, a definition of proximate cause generally has no materiality and is not required to be given in order to avoid prejudicial error when, under the facts of the case, the legal causation is clearly obvious and unmis-

takable, and failure to define proximate cause as such, by instructions of the court, could not have reasonably entered into and affected the result. See, Danielsen v. Eickhoff, 159 Neb. 374, 66 N. W. 2d 913; Kielley v. Mc-Cauley, 139 Neb. 60, 296 N. W. 437; Hildebrand v. Mc-Cauley, 139 Neb. 55, 296 N. W. 434.

In Lonsdale v. Union Ins. Co., 167 Neb. 56, 91 N. W. 2d 245, we reaffirmed that: "An insurance policy should be construed in the same manner as any other contract in order to give effect to the intent of the parties at the time it was made.

"The language therein used should be considered not in accordance with what the insurer intended the words to mean, but what a reasonable person in the position of insured would have understood them to mean.

"If the contract was prepared by the insurer and contains provisions reasonably subject to different interpretations, one favorable to the insurer and one advantageous to the insured, the one favorable to the latter will be adopted.

"In the construction of a contract, the instrument must be construed as a whole giving force and effect to all of the provisions of the contract.

"The parties to an insurance contract may make the contract in any legal form they desire and, in the absence of statutory provisions to the contrary, insurance companies have the same right as individuals to limit their liability and to impose whatever conditions they please upon their obligations, not inconsistent with public policy. If plainly expressed, insurers are entitled to have such exceptions and limitations construed and enforced as expressed." See, also, Koehn v. Union Fire Ins. Co., 152 Neb. 254, 40 N. W. 2d 874.

We have not heretofore construed and applied the language "collapse of the building or any part thereof." However, a few other courts have done so, with varying results in some respects, since the clause apparently first appeared in 1954. In that connection, defendant

cited and relied on Central Mutual Ins. Co. v. Royal, 269 Ala. 372, 113 So. 2d 680, which involved the provision "collapse of the house or a part thereof." The effect of that opinion was to hold that such language seemed to be a clear and unambiguous statement; that there could be no doubt about the meaning of the word "collapse"; and in so doing, cited Nugent v. General Ins. Co. of America, 253 F. 2d 800, another case relied upon by defendant herein, which involved what the Missouri court would probably hold, but the opinion failed to disclose what rules of construction it used in arriving at its conclusion that the word "collapse" in such a clause should be given its strict text definition.

Be that as it may, Central Mutual Ins. Co. v. Royal, *supra*, is factually distinguishable from the case at bar in all material respects. In that opinion, the court said: "In the case at bar there was no collapse of the building. There was no collapse of any part of the building. Some of the walls appeared to have cracks in them and in two or more places the concrete footing contained cracks, but there was no collapse of the building within the foregoing authorities. There was no falling in, no loss of shape, no reduction to flattened form or rubble of the building or any part thereof. The building was still in its original form and condition with the exception of a few cracks. Accordingly, we do not consider that the appellant was liable under the provisions of the policy to which we have referred or that the plaintiffs were entitled to recover." Also, a comparable situation appeared in Nugent v. General Ins. Co. of America, *supra.*

Defendant also relies upon Weiss v. Home Ins. Co., 9 App. Div. 2d 598, 189 N. Y. S. 2d 355, which involved the policy provision: "Collapse of building(s) or any part thereof including collapse caused by weight of ice, snow or sleet." Plaintiffs therein sought to recover damages for the alleged collapse of a lake dock. There was no proof as to whether or in what manner the dam-

age occurred or whether it occurred at the same time or gradually. The principal questions presented were whether such dock was a building within the meaning of the policy clause, and if so, whether the damage to it constituted "collapse." In that opinion the court said: "We agree with the trial court that 'To constitute the dock as a building under these circumstances however would require a strained construction which would not appear to be warranted by the facts.' But the decision need not depend upon that determination. The record is entirely barren of any proof that the damage to the dock constituted a 'collapse' within any accepted meaning of that word. Certainly the word involves an element of suddenness, a falling in, and total or near total destruction. Neither the oral testimony nor the photographic exhibits demonstrate any such thing. From the evidence it could as readily be determined that the damage to a portion of the dock was due to age or slow deterioration. Hence the plaintiffs have failed to sustain their burden of proof in establishing that their damage was caused by one of the perils insured against." Thus, that case is clearly distinguishable from the case at bar.

Plaintiffs herein rely upon recent cases almost directly in point. Travelers Fire Ins. Co. v. Whaley, 272 F. 2d 288, decided November 12, 1959, involved the clause "Collapse of building(s) or any part thereof." Decision therein turned upon whether there was a collapse of the basement foundation walls of the building under facts comparable in all material respects with those at bar. As in the case at bar, there was no claim that the building or any part thereof collapsed in the sense that it tumbled down or fell in a heap, and the insurance company, relying upon text definitions of "collapse," contended that the record did not support a finding that there was a collapse of part of the building within the meaning of the clause involved. The court's opinion, after citing and quoting from Grady v. Erhard, 143 Kan. 170, 53 P. 2d 478, said: "The court in that case

construed the word 'collapse' as it concluded the parties intended it should be used in the contract. So here, we must construe the word in the context it was used by the parties in executing this insurance contract. Did the parties intend there should be no coverage, and, therefore, no recoverable loss, unless there was a complete collapse and tumbling down of the foundation wall, so as to cause the superstructure to come crashing down in a heap of rubble; or did they mean the more realistic situation that if the foundation distintegrated by settling, pulling away or cracking so that it would no longer support the house, that there was a partial collapse? * * * If the appellant intended that the word 'collapse' should be ascribed the abstract dictionary definition it now contends for, it should have so stated. In the absence of such an expressed intent, we think it more realistic to define the terms in such a contract as connoting a sinking, bulging, cracking, pulling away of the wall so as to impair its function of supporting the superstructure and destroying its efficiency as a habitation."

Also, Jenkins v. United States Fire Ins. Co., 185 Kan. 665, 347 P. 2d 417, relied upon by plaintiffs, was decided December 12, 1959, and involved the clause "collapse of building(s) or any part thereof." Decision therein depended upon whether there was a collapse of the basement foundation walls of the building under facts comparable in all material respects with those at bar. As in the case at bar, there was no claim that the building or any part thereof collapsed in the sense that the basement walls had fallen, and the insurance company contended that there was no coverage under the collapse clause of the policy until the basement walls fell into a flattened, wrecked, or distorted shape. Referring to the evidence, the opinion said: "With respect thereto it suffices to say that although no one contends the basement walls had fallen, there was evidence of a crack running lengthwise almost all the way around the basement walls and, with reference to the north wall, that

such wall had settled, cracked and bulged to the extent its condition created an unsafe and dangerous situation with a possibility of its caving or falling in." The court then rejected the company's contention and, after pointing out that portion of the clause "or any part thereof," said: "When construed on the basis of intention, as required by the foregoing decision, and others therein cited, we believe the clause 'collapse of building or any part thereof' as used in the involved insurance contract is to be interpreted as comprehending that, if brought about by unusual and extraordinary circumstances which the parties to that agreement could not normally expect or foresee on the date of its execution, the settling, falling, cracking, bulging or breaking of the insured building or any part thereof in such manner as to materially impair the basic structure or substantial integrity of the building is to be regarded as a 'collapse' of the building within the meaning of that word as used in such clause of the policy. We further believe that questions relating to whether that condition came about under the previously related conditions and circumstances are questions of fact for the jury and the trial court." In that connection, such definition is in substance the language of instruction No. 5 given by the trial court in the case at bar, when considered in connection with all other instructions given.

Further, Bradish v. British American Assurance Co., 9 Wis. 2d 601, 101 N. W. 2d 814, relied upon by plaintiffs, was decided March 8, 1960, and involved the clause "Collapse of building(s) or any part thereof." Plaintiff therein contended that there was a collapse of a part of the building, to wit, the basement walls, under facts comparable in all material respects with those at bar, and defendant contended that there was no collapse whatever under the text definition of "collapse." In that connection, defendant contended that "collapse" meant: " 'To fall together or into an irregular mass or flattened form, through the loss of firm connection or

rigidity and support of the parts, or loss of the contents, as a building through the falling in of its sides, * * *.' " In such respect, the court then said: "Appellant submits that coverage against a collapse is limited to such an occurrence. Of course, such a falling would be a collapse. It is undisputed that this wall did not fall into an irregular mass or flattened form. The question is whether something short of a wall reduced to a heap of rubble will satisfy the term 'collapse' as used in the policy."

Thereafter, the opinion cited and quoted with approval from Travelers Fire Ins. Co. v. Whaley, *supra*, and Jenkins v. United States Fire Ins. Co., *supra*, as we have done, and said: "These facts demonstrated that before remedial measures were taken the basement south wall had bulged and cracked in such a manner as to impair materially the wall's basic structure and substantial integrity. We conclude, therefore, that a collapse occurred to a part of the insured building and the defendant is liable upon its policy for the loss attendant upon 'collapse.' "

In the light of such authorities relied upon by plaintiffs, it cannot be reasonably assumed that a person purchasing insurance for his home, including coverage for direct loss by "collapse of the building or any part thereof" understood such phrase as providing coverage if and only if his home, or at least a part thereof, falls together in an irregular mass or flattened form. Otherwise, the homeowner would be purchasing little if any added protection.

In deciding this case as one of first impression in this jurisdiction, we conclude that the authorities relied upon by plaintiffs, as heretofore mentioned and discussed, are sound and well-reasoned cases. We follow the reasoning and conclusions appearing therein, and decide that the verdict and judgment are supported by the evidence and are not excessive; and that the trial court did not err in overruling defendant's motion to dismiss or in re-

fusing to set aside the verdict and judgment and render a judgment for defendant pursuant to its motion. We also conclude that the trial court did not err prejudicially in giving instruction No. 5, or in failing to instruct on proximate cause, or in admitting exhibits Nos. 2 to 13, inclusive.

We turn then to plaintiffs' cross-appeal assigning that the trial court erred in overruling their motion for an allowance of attorneys' fees. In that connection, section 44-381, R. R. S. 1943, provides in part: "The court, upon rendering judgment against the insurance company upon any such policy of insurance mentioned in section 44-380, shall allow the plaintiff a reasonable sum as an attorney's fee to be taxed as part of the costs." Such policy of insurance mentioned in section 44-380, R. R. S. 1943, is one "written to insure any real property in this state against loss by fire, tornado, or lightning, * * *."

In Eddy v. German Ins. Co., 51 Neb. 291, 70 N. W. 947, this court said: "The right of a litigant in any case at law to recover costs is a statutory right; and in order that a litigant may recover an attorney's fee as part of his costs in a suit against an insurance company he must bring himself within the provisions of * * *" the applicable and controlling statutes.

Also, in Branson v. Branson, 84 Neb. 288, 121 N. W. 109, dealing with allowance of attorneys' fees, this court held that: "The power to award and tax costs in legal proceedings being unknown at common law, statutes providing therefor are to be strictly construed."

It is plaintiffs' contention that whenever the risk of loss by fire, tornado, or lightning is included in any insurance policy on real property in this state, then a judgment secured on any type of loss covered by the policy will entitle successful plaintiffs to an allowance of attorneys' fees taxed as costs in the proceedings. We do not agree. Here we are dealing with a policy called a "Comprehensive Dwelling Policy" containing

many different types of coverage organized into five different groups, and involving a multiplicity of risks in addition to fire, lightning, windstorm, and hail. Plaintiffs in this action recovered a judgment under the separate "collapse" coverage provision thereof, and not for any loss by fire, lightning, or windstorm, yet they contend that they were entitled to an allowance of attorneys' fees simply because the policy insured their real property from loss by fire or lightning for which they neither sought nor received a judgment. On the other hand, defendant contends that where there is multiple coverage combined under the terms of one single policy, the actual nature of the loss determines whether the provisions of section 44-381, R. R. S. 1943, apply. We agree. The very wording of the statutes so indicate. See, Omaha Fire Ins. Co. v. Thompson, 50 Neb. 580, 70 N. W. 30; Security State Bank v. Aetna Ins. Co., 106 Neb. 126, 183 N. W. 92. We conclude that in order to recover an allowance of attorneys' fees under sections 44-380 and 44-381, R. R. S. 1943: (1) There must be a judgment recovered against an insurance company upon an insurance policy; (2) the policy must be one "written to insure any real property in this state against loss by fire, tornado, or lightning"; and (3) the actual loss must be caused by fire, tornado, or lightning. Otherwise, such statutory provisions would be extended far beyond the original intent of the Legislature and cover every conceivable type of loss, whether to real or personal property or otherwise which happened to be covered in a multiple risk insurance policy, which included provisions insuring against fire, tornado, or lightning.

We conclude that the trial court properly denied plaintiffs any allowance for attorneys' fees, and that the judgment of the trial court in all respects should be and hereby is affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.