## 72725, 72726. NATIONWIDE MUTUAL FIRE INSURANCE COMPANY v. TOMLIN et al.; and vice versa.
(352 SE2d 612)

BENHAM, Judge.

These cases involve an appeal by Nationwide Mutual Fire Insurance Company ("Nationwide") from the denial in a bench trial of its motion for judgment in its behalf in a suit concerning the interpretation of an "all risk" insurance policy (Case No. 72725), and a cross-appeal by the Tomlins contesting the trial court's application of the one-year period of limitation contained in the policy (Case No. 72726).

The following facts gave rise to this controversy. In June 1980, the Tomlins purchased a home in DeKalb County and, in the same year, purchased an "all risk" homeowners insurance policy from Nationwide. On October 15, 1983, the Tomlins discovered cracks in the exterior walls of their house and immediately reported the condition to Nationwide. Two months later, an adjuster visited the Tomlins' home and informed them that the condition was due to the settling of the foundation, which was not covered under the policy. Dissatisfied with the first determination and having observed a worsening of the condition of their home, the Tomlins requested that Nationwide send an engineer to view the condition. Within several weeks of the request, an engineer did inspect the property and on January 11, 1984, made a report to Nationwide, but not to the Tomlins, speculating that the problem might be caused by a decaying tree trunk under the foundation. On March 26, 1984, the Tomlins, with the help of neighbors, dug under a portion of the house and discovered that the damage was being caused by rotting logs and debris located beneath a cold joint[1] under the foundation. A suit was filed against the contractor and several other agencies, which is not for consideration here, but on December 19, 1984, the Tomlins filed suit against Nationwide under the "all risk" insurance policy.

1. The most predominant of Nationwide's challenges enumerates as error the interpretation given by the trial court to the word "collapse" contained in the policy. The contractual language that relates to this enumeration reads as follows: "Part II of this Policy Insures Against all Direct Loss from the Following Named Perils: . . . 11. Collapse of a building or any part thereof . . . This Policy Does not Insure under Either Part I or Part II, Against Loss Resulting from: . . . 9. Any of the following, *except* direct loss by fire, smoke, explosion, *collapse of buildings* . . . resulting therefrom . . . (d) settling, cracking, shrinkage, bulging, or expansion of pavements, patios, foun-

---

[1] Cold joint — place where two surfaces of the foundation meet but are not joined.

dations, walls, floors, ceilings or roofs." (Emphasis supplied.)

The trial judge found in part as follows: "It appears the foundation was built on tree stumps. When the tree stumps decayed, the foundation began to sink. The exterior brick walls of the house have cracked and pulled away from the structure. Plaintiffs have installed wood supports against the walls to prevent them from falling . . . The term collapse is not specifically defined in the insurance policy. The average consumer cannot ascertain from the policy whether 'collapse' means a single, total, structural failure as [appellant] contends or a gradual structural deterioration." Nationwide contends that the word "collapse" is controlling, that the condition complained of amounts to settling, which is excepted, and that the trial court erred in ruling that the word "collapse" as used in the policy is ambiguous. Citing *Henderson v. Henderson*, 152 Ga. App. 846 (264 SE2d 299) (1979), and a host of other cases, appellant contends that the trial court erred in not applying the plain, ordinary, and popular meaning of "collapse."

We begin our discussion of this matter by first determining if there is any ambiguity, for if the language is plain, unambiguous, and capable of only one reasonable interpretation, as Nationwide contends, there can be no construction of the contract. *Wolverine Ins. Co. v. Jack Jordan, Inc.*, 213 Ga. 299, 302 (99 SE2d 95) (1957). An excellent etymology of the word "collapse" is contained in *Govt. Employees Ins. Co. v. DeJames*, 256 Md. 717 (261 A2d 747) (1970). For purposes of determining if ambiguity exists here, we look not at "collapse" in isolation, but in the context of the whole policy and in relation to the claimed loss. In trying to resolve whether an ambiguity exists, we favor an approach similar to that used by the Supreme Court of New York in *Barash v. Ins. Co. of North America*, 114 Misc2d 325 (451 NYS2d 603, 605) (1982): (1) Would it be unreasonable for an average person to give the meaning to "collapse" as urged by the insured?; and (2) Would the construction urged by the insurer be the only one that could be fairly placed on the word "collapse?" When viewing the policy as a whole, we agree with the trial court that an ambiguity does exist.

Having found the term at issue to be ambiguous, we must next determine whether the trial court correctly applied the applicable rules of construction. *Travelers Ins. Co. v. Blakey*, 255 Ga. 699 (342 SE2d 308) (1986). In construing the contract, the court must be guided by well-established principles of contract construction which require that where language is ambiguous in an insurance policy, it must be construed in a light favorable to the insured. OCGA § 13-2-2 (5). We note also that the insurance policy itself, in addressing the issue of collapse provides a pictorial example, depicting a house with a sagging roof, which is something less than a complete collapse in the

traditional sense of the word as urged by appellant.

Since this is a case of first impression in Georgia; that is, what does "collapse" mean in an "all risk" homeowners policy, we have considered approaches taken by other states in interpreting a homeowners policy. The majority view is best expressed in *Higgins v. Conn. Fire Ins. Co.*, 163 Colo. 292 (430 P2d 479, 480) (1967), which states that "the word [collapse] connotes a complete change in a structure, where the building loses its distinctive character as a building and when the substantial integrity of the building has been damaged to such an extent that it has been materially impaired and rendered uninhabitable . . ." See also *Olmstead v. Lumbermen's Mut. Ins. Co.*, 22 Ohio St. 2d 212 (259 NE2d 123) (1970). A similar view was taken in *Graffeo v. U. S. Fidelity &c. Co.*, 246 NYS2d 258 (N.Y. 1964), where "collapse" was interpreted to include "an element of suddenness, falling in, and total or near destruction."

A contrary view is expressed in *Govt. Employees Ins. Co. v. DeJames*, supra at 751, which defines "collapse" as "any serious impairment of structural integrity." Because that interpretation more realistically reflects the purposes of the policy, we adopt it as our own. In applying this test to the facts of this case, we conclude, as did the trial court, that the condition is covered under the policy. We further refine the definition in *Govt. Employees Ins. Co.* and announce that in this state, when "collapse" is not otherwise defined in an insurance policy, it shall be deemed as having occurred when there is a reasonably detectable serious impairment of structural integrity.

Nationwide proffers a host of cases in urging this court to adopt a plain meaning approach. We are unpersuaded by appellant's position, since each of the cases cited is distinguishable: in *Higgins v. Conn. Fire Ins. Co.*, supra, there was no worsening of the condition as here. *Olmstead v. Lumbermen's Mut. Ins. Co.*, supra; and *Stewart v. Preferred Fire Ins. Co.*, 206 Kan. 247 (477 P2d 966) (1970), were "named peril" policies as opposed to "all risk" policies. *LaSalle Nat. Bank v. American Ins. Co.*, 14 Ill. App. 3d 1027 (303 NE2d 770) (1973), dealt with an inherent rather than extraneous cause of collapse. *New Zealand Ins. Co. v. Lenoff*, 315 F2d 95 (9th Cir. 1963), dealt extensively with the meaning of "settling" rather than "collapse." *Graffeo v. U. S. Fidelity &c. Co.*, supra, followed the prior decisions of the New York court, which required an element of suddenness. There is no such requirement in Georgia.

We are more inclined to follow the lead of *Great Eastern Cas. Co. v. Blackwelder*, 21 Ga. App. 586 (94 SE 843) (1917), one of the earliest decisions in this state. In *Great Eastern*, in interpreting the meaning of the word "building," the court also mentioned "collapsed." In finding the insurance company liable, it held that in a contract of adhesion where the language is susceptible to two or more

meanings, the meaning most favorable to the insured is to be preferred if it can be done without doing violence to the contract. *Great Eastern*, at 592, states: "It is not necessary for the plaintiff's recovery to show that the entire building collapsed." This view is in keeping with the decisions in *Govt. Employees Ins. Co. v. DeJames*, supra; *Mattis v. State Farm Fire &c. Co.*, 454 NE2d 1156 (Ill. App. 5th Dist. 1983); *Rogers v. Md. Cas. Co.*, 252 Iowa 1096 (109 NW2d 435) (1961); *Morton v. Travelers Indem. Co.*, 171 Neb. 433 (106 NW2d 710) (1960); *Auto Owners Ins. Co. v. Allen*, 362 S2d 176 (Fla. App. 1978); and *Jenkins v. U. S. Fire Ins. Co.*, 185 Kan. 665 (347 P2d 417) (1959). In light of our analysis, appellant Nationwide's enumeration of error is without merit.

Since we have announced a new rule, we see a need to explain the necessity for the rule over and beyond the normal rules of contract construction. The approach we take is in keeping with the law's general disfavor of penalties and in keeping with the rule of construction favoring the enforceability of contracts. See *Sale v. Leachman*, 218 Ga. 834, 837 (131 SE2d 185) (1963); *Leffler Co. v. Dickerson*, 1 Ga. App. 63 (57 SE 911) (1907).

While an approach disfavoring economic waste is not overriding, it is at least enlightening. There was unrefuted testimony that the seriously deteriorating condition of the Tomlin home would eventually lead to a collapse in the traditional sense, thereby possibly subjecting the inhabitants to electrocution due to the proximity of the shower to the electrical box or to serious injury or death due to the house caving in upon the occupants. Such a calamity undoubtedly would be wasteful, not only of material resources but also of human resources. The rule we announce today is one of reason in that it requires the insured to notify the insurer at the earliest possible date, and it allows the insurer to make repairs at a time when costs are low and risks to life and health are minimal. Inevitably, we see an ever-increasing need to apply an economic yardstick to our decisions to measure their economic feasibility.

2. We will simultaneously consider Nationwide's second enumeration of error and the Tomlins' cross-appeal, since they both involve the same issue, the period of limitation.

After having determined that an ambiguity existed, the trial court applied the rules of construction and ruled in favor of the Tomlins on the interpretation to be given the word "collapse." Having lost that battle, Nationwide contended both at trial and now here that the one-year period of limitation contained in the policy had expired when the Tomlins filed suit. That provision reads as follows: "9. Suit. No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with and: . . . a. if under cov-

erage of real or personal property, unless commenced within twelve months next *after* inception of the loss." (Emphasis supplied.)

The trial court found that the Tomlins discovered cracks in the exterior walls on October 15, 1983, and that they filed suit on December 19, 1984. The trial court found that all damage accruing prior to December 19, 1983, was not recoverable due to the 12-month period of limitation, and went on to award the Tomlins damages of $10,594, the amount of damages suffered by appellees between December 20, 1983, and the date of trial, December 16, 1985. The date of December 19, 1983, was reached by counting back one year from the date the lawsuit was filed, December 19, 1984. Assuming that the issue of the period of limitation was not waived by appellant, under the interpretation of the word "collapse" announced in Division 1: "Unless otherwise defined, a collapse occurs when there is a detectable serious impairment of structural integrity," appellant's argument must fail. Under the facts of this case, the inception of the loss began when it was detectable. Although a structural engineer speculated as to the cause of the loss, the true cause was not determined until March 26, 1984, when an excavation revealed the decaying timbers under a cold joint. Since the loss did not occur under the definition of "collapse" until March 26, 1984, the suit was filed on December 19, 1984 and was well within the one-year period.

3. In its third enumeration of error, Nationwide argues, without citing authority, that the trial court erred in admitting the testimony of what it considered to be a non-expert witness. This enumeration is totally untenable since the record is replete with information concerning the witness' qualifications. In the absence of an abuse of discretion, and we find none, the trial court was authorized to allow the testimony of the challenged witness. *Hardin v. Hunter*, 174 Ga. App. 756 (1) (331 SE2d 83) (1985).

4. In its last enumeration of error, Nationwide contends that the trial court erred in rendering judgment for plaintiff due to the inadequacy of proof as to damages.

The basic thrust of appellant's argument is that there was inadequate evidence presented to allow the trial court to distinguish between pre-December 19, 1983, damages and post-December 19, 1983, damages. To the extent this enumeration challenges the general sufficiency of the evidence as to damages, we will outline what the trial court was authorized to find. Not only was there evidence from Mr. Tomlin as to damages, but there was virtually unrefuted evidence from an expert witness, an engineering graduate of the Georgia Institute of Technology, whose testimony was found admissible in Division 3, that from his view of the property and study of admitted exhibits, there were cracks on the sheet rock tapes, gyp board, and the first and second floors. Interior walls and exterior walls, including the

brick veneer, had moved. Windows were bulging out of the frames. Ever-widening cracks appeared over wooden frames and in the garage floor. Galvanized metal ties which held the bricks had been severed, and the foundation had dropped from 10 to 12 inches. Based on this testimony, including a review of the R. S. Means Company manual on repairing and remodeling homes, he opined that damage amounted to between $10,000 and $12,000 at a minimum, and that post-December 19, 1983, damages amounted to $10,594. This evidence was more than sufficient to withstand any reasonable challenge as to damages being uncertain. *Ga. Mut. Ins. Co. v. Ford*, 95 Ga. App. 748 (98 SE2d 577) (1957).

We affirm the judgment of the trial court but remand the case for a determination of the damages to be awarded the Tomlins not inconsistent with this opinion.

*Judgment affirmed in Case No. 72725. Judgment affirmed and case remanded with direction in Case No. 72726. Deen, P. J., concurs. Beasley, J., concurs specially.*

BEASLEY, Judge, concurring specially.

I concur in the judgment only.

I cannot join in giving the judicial definition to the term "collapse" in this and an unknown number of insurance contracts which is declared in this case. As I understand it, the word "collapse" (when otherwise not defined in the policy) would mean "a reasonably detectable serious impairment of structural integrity." I do not believe this is the same thing, as such a condition may exist without collapse.

The word is both a noun and a verb. The policy states: "PART II OF THIS POLICY INSURES AGAINST ALL DIRECT LOSS FROM THE FOLLOWING NAMED PERILS: . . . 11. Collapse[1] of a building or any part thereof."

As I see it, "collapse," in use here as a noun, is a process. It may occur suddenly, as when hit by a great external force; or it may occur less traumatically, as when caused by internal weakening. Here it is evident the building, or wall, was in the process of collapsing and that it would have totally collapsed with the mere passage of time, but for the intervention of a human agency. There was evidence that total collapse, or breakdown, was otherwise inevitable, predictable, and irreversible. Instead of the process of collapse continuing to totality, the alert homeowner intervened and prevented the total collapse by ferreting out the source of the problem and stopping the process of collapsing. He had also conscientiously purchased an all-risk insurance policy to shield him from financial loss should his home be dam-

---

[1] This word in the phrase is in bold print.

aged in whole or in part due to the peril denominated "collapse." The law ordinarily favors one who mitigates his damages. OCGA § 13-6-5; *Kingston Pencil Corp. v. Jordan*, 115 Ga. App. 333, 334 (1) (154 SE2d 650) (1967).

Except when words of art are being used, we are to construe the words in contracts as having their plain and ordinary, usual meaning. OCGA § 13-2-2 (2). I would attach to it in this context that meaning rather than the one chosen by the majority from among the many possibilities discussed as coming from other cases. I am afraid that the meaning attributed to the word adds a connotation which may very well not have been intended. If it was, it is rather obtuse, and the court is writing these other words into this and untold numbers of existing contracts.

But it is the intention of the parties which we are charged with ascertaining. OCGA § 13-2-3. We ought whenever possible to give the denotative meaning, as that is the common denominator. In the marketplace of insurance contracts made with lay people, the ordinary use of words, the meaning generally ascribed to by the public, should be given because the insureds have no choice of words since they do not participate in drafting. The law construes the words of contracts against the drafter for that reason. See *Kytle v. Ga. Farm Bureau Mut. Ins. Co.*, 128 Ga. App. 109, 112 (1) (195 SE2d 787) (1973). We are governed by the principle that "[i]n construing an insurance policy, '[t]he test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney.' [Cit.]" *Greer v. IDS Life Ins. Co.*, 149 Ga. App. 61, 63 (253 SE2d 408) (1979).

In the contract the word is not restricted by the use of words such as "final" or "total" or some other such language which would denote an intention of the parties that it was not meant to cover damage resulting from any stage of a collapse in progress. It is not an ambiguous term, involving a choice between two or more constructions (see *Burden v. Thomas*, 104 Ga. App. 300, 302 (121 SE2d 684) (1961)), but simply an unqualified one. In construing the scope of coverage, as opposed to the scope of exclusions, a broad view is taken. *James v. Penn. Gen. Ins. Co.*, 167 Ga. App. 427, 431 (306 SE2d 422) (1983); *Mut. Life Ins. Co. of New York v. Bishop*, 132 Ga. App. 816, 817 (1) (209 SE2d 223) (1974). "Had the insurance company desired coverage to be more restrictive, it could have drafted the policy accordingly." *Greer*, supra at 63.

Of course, there would have to be proof persuasive to the factfinder that this is indeed what was happening when the collapse was arrested in progress.

DECIDED DECEMBER 5, 1986 —
REHEARING DENIED DECEMBER 19, 1986 —

William A. Dinges, William D. Strickland, for appellant.
H. Martin Huddleston, Nancy K. Wasserman, for appellees.