## Carter L. Beach et al. *v.* Middlesex Mutual Assurance Company
### (13130)

Peters, C. J., Shea, Callahan, Covello, and Hull, Js.

Argued September 30—decision released November 10, 1987

*Thomas W. Witherington,* for the appellant (defendant).

*William G. Rhines,* for the appellees (plaintiffs).

PETERS, C. J. The principal issue in this appeal is whether there is latent ambiguity in the term "collapse" in a homeowner insurance policy. The plaintiffs, Carter Beach and Mary Lawton Beach, filed a complaint seeking damages from the defendant, Middlesex Mutual Assurance Company, for an alleged "collapse" within the terms of the insurance policy issued to them by the defendant. The defendant denied that a collapse had occurred, claiming instead that the damage to the plaintiffs' home was due solely to the "settlement of earth movements," a type of loss excluded under the policy.

An attorney state trial referee, after a hearing, recommended judgment for the plaintiffs in the amount of $26,607.31. The trial court adopted that recommendation and accordingly rendered judgment for the plaintiffs. The defendant's appeal challenges both the construction of its insurance policy and the calculation of damages. We find error in part on the latter issue.

The uncontested findings of the trial referee reveal the following facts. The plaintiffs, Carter and Mary Lawton Beach, own a home located on a steep slope next to Candlewood Lake in New Milford. On a visit to the property in February, 1976, Carter Beach noticed a crack in the north foundation wall of the building. In response to timely notification of a claim of an insured loss, the defendant insurer promptly sent its claims adjuster, Robert Keaney, to inspect the crack and the ensuing damages. The adjuster noted not only the crack but also a separation between the top of the foundation wall and the "plate" or bottom of the building wall. By letter dated March 17, 1976, the adjuster

advised the plaintiffs that the insurance company had denied coverage for their claim "due to the fact [that] settlement was the cause of the damage." The insurance contract expressly excluded coverage for damages arising from "settling, cracking, shrinkage, bulging or expansion."[1]

The crack in the north foundation wall continued to widen, and by May of 1976 had reached a width of approximately nine inches. In addition, wooden support beams on top of the foundation wall had pulled apart and the concrete floor of the patio adjacent to the north side of the house had cracked and fallen in. Concerned over this deteriorating state of affairs, Carter Beach requested a site visit by the defendant's engineer, but was told that coverage would still be denied because no "collapse" of his home had occurred.

In July of 1976, the plaintiffs began to arrange for reconstruction of their home. A building contractor, Kenneth Lathrop, viewed the premises and later testified that the foundation wall had tipped over into the basement from the top and was no longer supporting the house. Because the house never actually caved in, the plaintiffs continued in occupancy during the period in which Lathrop undertook the needed structural repairs. Despite the nonoccurrence of a sudden catastrophe, the trial referee heard and found credible the testimony of a number of witnesses that the house

---

[1] The relevant policy provision reads: "This policy does not insure against loss . . . Under Coverages A and B . . . 1. by wear and tear; marring or scratching; deterioration; inherent vice; latent defect; mechanical breakdown; rust; mold; wet or dry rot; contamination; smog; smoke from agricultural smudging or industrial operations; settling, cracking, shrinkage, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; birds, vermin, rodents, insects or domestic animals; unless loss by fire, smoke (other than smoke from agricultural smudging or industrial operations), explosions, collapse of a building, glass breakage or water not otherwise excluded ensues, then this policy shall cover only such ensuing loss."

would have caved in had the plaintiffs not acted to repair the damage. The trial referee expressly found that "[g]iven the state of the structure, eventually the house would have fallen into the cellar." The referee went on to conclude that "the foundation in the Plaintiffs' house cracked; that the foundation failed structurally, and that the function of the foundation, both as a support structure for the house and a retaining wall, had become materially impaired, constituting a collapse."

The trial court rendered judgment in accordance with the report of the trial referee. The court articulated its reasons as follows: "It [the referee's report] was accepted because we found it to be sound, comprehensive and logical both factually and legally, including the recommendations: (i) that a 'collapse' in the sense of a material impairment of the basic structure of a building was included within the coverage of the insurance policy involved in this action; and (ii) that the structure in question was in imminent danger of falling over, both of which are adopted by the undersigned."

The defendant claims that the trial court erred in: (1) defining a "collapse" within the policy to mean a "material impairment of the basic structure of a building"; and (2) calculating damages to include the cost of replacing the plaintiffs' septic tank system and the cost of various "preventive" measures undertaken by the building contractor. We find error in part on the latter issue.

## I

The defendant first urges us to find error in the trial court's construction of the term "collapse" in the insurance policy. If the language of the policy is clear and unambiguous, its terms will be given their ordinary and natural meaning. *Horak* v. *Middlesex Mutual Assurance Co.*, 181 Conn. 614, 616, 436 A.2d 783 (1980);

*Weingarten* v. *Allstate Ins. Co.,* 169 Conn. 502, 509–10, 363 A.2d 1055 (1975). If, to the contrary, insurance coverage is defined in terms that are ambiguous, such ambiguity is, in accordance with standard rules of construction, resolved against the insurance company. "Where the terms of the policy are of doubtful meaning, the construction most favorable to the insured will be adopted." *LaBonte* v. *Federal Mutual Ins. Co.,* 159 Conn. 252, 256, 268 A.2d 663 (1970); see also *Griswold* v. *Union Labor Life Ins. Co.,* 186 Conn. 507, 514, 442 A.2d 920 (1982); *Simses* v. *North American Co. for Life & Health Ins.,* 175 Conn. 77, 84–85, 394 A.2d 710 (1978). The defendant conceded, at oral argument, that if its policy contains a relevant ambiguity, it cannot hope to overturn the trial court's conclusion assigning it liability for the plaintiffs' structural damage.

The precise language that we must construe is as follows: "This policy does not insure against loss . . . [u]nder Coverages A and B . . . 1. by . . . settling, cracking, shrinkage, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings . . . unless . . . collapse of a building . . . not otherwise excluded ensues, then this policy shall cover only such ensuing loss." In the defendant's view, the term "collapse" in this policy unambiguously contemplates a sudden and complete falling in of a structure. This argument comes to us in two versions, neither of which we find persuasive.

First, the defendant claims that the standard dictionary definition of "collapse" on its face unambiguously connotes a sudden and complete catastrophe. A "collapse" is there defined as "a breakdown in vital energy, strength, or stamina: complete sudden enervation: sudden loss of accustomed abilities . . . an abnormal falling together of the walls of an organ . . . ." Webster, Third New International Dictionary. This definition does not definitively support the defendant's narrow

reading. Although "collapse" encompasses a catastrophic breakdown, as the defendant argues, it also includes a breakdown or loss of structural strength, as the plaintiffs maintain. If the defendant wished to rely on a single facial meaning of the term "collapse" as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended. See, e.g., *Nida* v. *State Farm Fire & Casualty Co.*, 454 So. 2d 328, 334 (La. App. 1984). As presently drafted, "collapse" is not on its face unambiguous.

Second, the defendant claims that its interpretation unambiguously finds support in the policy as a whole. A narrow interpretation, it argues, is the only one consistent with the terms of the clause excluding liability for loss by "settling, cracking, shrinkage, bulging or expansion." According to the defendant, the terms of the exclusionary clause modify and inform the meaning of "collapse" and necessarily narrow the purview of "collapse" to casualty of a sudden and cataclysmic nature. While we agree that the defendant's reading of the relationship between the terms of the exclusionary clause and the meaning of "collapse" is a plausible one, an alternate reading is equally reasonable, and that is sufficient to defeat the defendant's claim of error. As the plaintiffs contend, the policy may reasonably be read to exclude loss related to "settling, cracking, shrinkage, bulging or expansion," only so long as "collapse" does not ensue. Nowhere does the policy express a clear unambiguous intent to exclude coverage for a catastrophe that subsequently develops out of a loss that appeared, at its inception, to fall within the rubric of "settling, cracking, shrinkage, bulging or expansion." On the contrary, the disputed policy provision covers a loss for "collapse" which, not otherwise being excluded, "ensues." To "ensue" means "to follow as a chance, likely, or necessary consequence: result

. . . to follow in chronological succession." Webster, Third New International Dictionary. By its reference to a "collapse" that "ensues," the policy in this case can reasonably be understood to have contemplated coverage for a "collapse" that follows consequentially from excluded activity. Read in its entirety, therefore, the defendant's policy does not unambiguously limit its liability to a "collapse" of a sudden and catastrophic nature.

The result that we reach finds support in the reasoning of other courts. Although the judicial decisions elsewhere are divided, the more persuasive authorities hold that the term "collapse" is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building. See, e.g., *Auto Owners Ins. Co.* v. *Allen,* 362 So. 2d 176, 177–78 (Fla. App. 1978); *Nationwide Mutual Fire Ins. Co.* v. *Tomlin,* 181 Ga. App. 413, 416, 352 S.E.2d 612 (1986); *Rogers* v. *Maryland Casualty Co.,* 252 Iowa 1096, 1102, 109 N.W.2d 435 (1961); *Government Employees Ins. Co.* v. *DeJames,* 256 Md. 717, 724, 261 A.2d 747 (1970); *Vormelker* v. *Oleksinski,* 40 Mich. App. 618, 632, 199 N.W.2d 287 (1972); *Morton* v. *Travelers Indemnity Co.,* 171 Neb. 433, 449, 106 N.W.2d 710 (1960); *Morton* v. *Great American Ins. Co.,* 77 N.M. 35, 38–39, 419 P.2d 239 (1966); *Employers Mutual Casualty Co.* v. *Nelson,* 361 S.W.2d 704, 709 (Tex. 1962); *Thornewell* v. *Indiana Lumbermens Mutual Ins. Co.,* 33 Wis. 2d 344, 349, 147 N.W.2d 317 (1967). The cases to the contrary, which hold that "collapse" unmistakably connotes a sudden falling in, loss of shape, or flattening into a mass of rubble, have come to be in the distinct minority. See, e.g., *Higgins* v. *Connecticut Fire Ins. Co.,* 163 Colo. 292, 295–96, 430 P.2d 479 (1967); *Eaglestein* v. *Pacific National Fire Ins. Co.,* 377 S.W.2d 540, 545 (Mo. App. 1964); *Graffeo* v. *United States Fidelity & Guaranty*

*Co.,* 20 App. Div. 2d 643, 644, 246 N.Y.S.2d 258 (1964); *Olmstead* v. *Lumbermens Mutual Ins. Co.,* 22 Ohio St. 2d 212, 216, 259 N.E.2d 123 (1970).

The defendant's appeal, on this issue, challenges only the definition to be accorded to the term "collapse" in its insurance policy. Having determined that the trial court was correct in its conclusion that this term includes a substantial impairment of the structural integrity of a building, we need only note that the trial referee found, as a matter of fact, that the plaintiffs had proven such impairment of their house. This uncontested finding warrants a judgment holding the defendant liable even though no actual caving-in occurred and the structure was not rendered completely uninhabitable. [2] See *Auto Owners Ins. Co.* v. *Allen,* supra, 177 n.1.

## II

The defendant next claims error in the trial court's calculation of damages. This claim has two parts. According to the defendant, the plaintiffs have failed to demonstrate a causal connection between the structural impairment of their house and (1) their replacement of the septic tank system, or (2) their installation of drains incidental to the repair and replacement of damaged landscaping, driveway, parking areas and sidewalks. We agree with the defendant's claim insofar as it pertains to the septic tank system.

The plaintiff Carter Beach provided the only evidence concerning the factual link between the collapse of the foundation wall of the plaintiffs' building and the need for the installation of a new septic tank system. The defendant has not challenged Beach's credentials, as a licensed professional engineer, to render an expert

---

[2] Requiring the insured to await an actual collapse would not only be economically wasteful; *Nationwide Mutual Fire Ins. Co.* v. *Tomlin,* 181 Ga. App. 413, 416, 352 S.E.2d 612 (1986); but would also conflict with the insured's contractual and common law duty to mitigate damages.

opinion on the issue of causality. What is at issue is the fact of causality itself. On direct examination, Beach testified that he "realized something was wrong with the septic tank" before he noticed the crack in the foundation wall. He had started to repair the septic tank before he became aware of the crack in the wall, but later "made the assumption" that the problems were related. Under cross-examination, Beach admitted he had "no hard evidence" of a relationship other than mere coincidence. Relying exclusively on this testimony for evidence of a causal relationship, the trial referee awarded the plaintiffs $3696.66 in damages for the cost of a new septic tank system.

Beach's testimony, even if fully credited, falls short of establishing the necessary degree of causation in this case.[3] Although an expert witness is not required to express an opinion with absolute certainty, he or she must at least speak in terms of the probable and not merely the possible. *Healy* v. *White*, 173 Conn. 438, 443, 378 A.2d 540 (1977). In his testimony, Beach candidly revealed that he had only "assumed" the existence of a causal relationship. Nothing in the record either confirms or rebuts this assumption. In the absence of proof of causation in fact, the plaintiffs were not entitled to recover damages for the cost of replacing their septic tank system. Cf. *Boehm* v. *Kish*, 201 Conn. 385, 517 A.2d 624 (1986).

The defendant also challenges the sufficiency of evidence underlying the award of $1350 for expenses

[3] The plaintiffs claim that the relevant standard for assessing damages in this case is not the common law test of causation in fact but instead a contractual standard contemplated by the term "ensues" in the insurance policy. We need not, however, decide whether the plaintiffs are correct in this claim. Even if we were to accept the premise that the term "ensues" imposes a lesser burden of proof upon the plaintiffs, we would still conclude that the plaintiffs have failed to show any credible link between the installation of the septic tank system and the collapse of their foundation wall.

incurred in the reconstruction process. The gist of its claim is that the installation of certain drains and other construction items incidental to the rebuilding of the retaining wall were optional or preventive measures not necessitated by the collapse. The undisputed facts belie such an assertion. Carter Beach testified that the drain and retaining wall work was ordinary and standard construction trade practice. On the basis of this competent evidence, the referee was justified in finding the work to be causally related to the loss and the trial court appropriately confirmed this finding.

There is error in part and the case is remanded to the trial court with direction to modify the judgment so as to reduce by $3696.66 the amount of the plaintiffs' recovery of damages.

In this opinion the other justices concurred.