EMPLOYERS MUTUAL CASUALTY
COMPANY OF DES MOINES,
IOWA, Petitioner,

v.

William Martin NELSON, Respondent.

No. A–8751.

Supreme Court of Texas.

Oct. 24, 1962.

Rehearing Denied Nov. 28, 1962.

Bryan & Patton, Julietta Jarvis, Houston, with above firm, for petitioner.

Blakeley & Williams, Houston, for respondent.

CULVER, Justice.

The respondent, Nelson, filed this suit against Employers Mutual Casualty Company to recover under a standard "physical loss" policy of insurance issued by it covering Nelson's residence in the City of Houston. Judgment was entered for the insured based on a jury verdict. The Court of Civil Appeals has affirmed. 351 S.W.2d 278.

Nelson's home is of frame construction, with composition type roof. On or about June 24, 1957, a construction company operating under authority from the City commenced the excavation for a sewer line along the street in front of Nelson's home. The insured complains of various items of damage to his house including cracks in the foundation and sheetrock walls, misalignment of doors and slanting of the floors, all of which he alleges were caused by the company in the construction and installation of this sewer line.

Insured asserts that the damage resulted from vibration and concussion caused by the

repeated dropping of a large steel ball used in breaking up the pavement and the installation and removal of steel pilings. In addition as a contributing cause he claims that there existed beneath his foundation a stratum of sand which shifts when lateral support is removed and that shifting occurred by reason of the sewer excavation.

At the outset the insurer contends that no recovery under this policy is permitted because it expressly excludes loss occasioned by enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures. Under this exclusion the insurer maintains that since the sewer construction contract was let in accordance with a valid ordinance of the City providing therefor, if the loss as claimed was occasioned by the construction of the sewer, then there is no coverage provided.

■ The point is not well taken. The exclusion, in our opinion, has reference to damage brought about by the exercise of the police power rather than that produced on account of work contracted for by the authorities. The cases relied upon by the insurer bear out this distinction.

In Conner v. Manchester Assurance Co., 9 Cir., 130 F. 743, the policy provided that the insurer should not be liable for loss caused directly or indirectly by order of any civil authority. The county supervisors under statutory authority ordered fires started to destroy harmful insects. The insured was not allowed recovery for grain damaged by the fire even though the loss was indirectly caused thereby and was not an intentional result. On somewhat similar facts and under a like exclusionary provision recovery was also denied in Hocking v. British American Assurance Co., 62 Wash. 73, 113 P. 259, 36 L.R.A.,N.S., 1155; Joplin v. National L. S. Ins. Ass'n, 61 Or. 544, 122 P. 897, 44 L.R.A.,N.S., 569; Aetna Ins. Co. v. Boon, 95 U.S. 117, 24 L.Ed. 395.

The City is not liable for the enforcement of an ordinance regulating the health and welfare of its citizens but is responsible when it damages or takes property in the construction of public works and this we think points up the distinction.

What the policy excludes is such damage for instance as that caused by the enforcement of an ordinance condemning property that is hazardous and unsafe, zoning regulations and the like.[1]

■ The insurer further contends that whatever damage there was to insured's house was the result of normal forces of nature and therefore not covered by the terms of the policy since it excludes and does not insure against "normal settling, shrinkage or expansion in foundations, walls, floors or ceilings,"; however, the exclusion expressly does not apply to "total or partial collapse". The jury found that the damages were not the result of normal settling and also found that the house suffered a partial collapse.

The first issue was submitted as follows:

"Was the damage, if any, to the plaintiff's house which occurred subsequent to June 24, 1957, the result of normal settling, shrinkage or expansion in foundations, walls, floors or ceilings?

"If you find from a preponderance of the evidence that such damage, if any, was not caused by normal settling, shrinkage or expansion in foundations, walls, floors, or ceilings, let your answer be, 'It was not the result of normal settling.' Otherwise, let your answer be, 'It was the result of normal settling.'

"In connection with the foregoing Special Issue, you are instructed that the term 'normal settling' means a sinking or subsidence caused by usual or regular conditions, as distinct from abnormal (that is, unusual or irregular) conditions."

1. See the discussion in Scanlan v. Home Ins. Co., Tex.Civ.App., 1935, 79 S.W.2d 186, wr. ref.

The insurer objected to the definition of "normal settling" and to the refusal of its request that the term "normal" be defined as including "not only those forces which are constantly and habitually operating, but also those forces which operate periodically or with a certain degree of frequency." The company's position is that the instruction given by the court is too restrictive because periodic weather conditions of drouth and rainfall are normal even though unusual or irregular. Hence, it claims that the jury might well have considered that although the damage was inflicted on account of periodic conditions the settling or expansion was not normal because those conditions were to be taken as unusual and irregular, and hence abnormal.

■ The Restatement of Law, Torts, § 302, defines the word "normal" as follows:

"The actor as a reasonable man is required to anticipate and provide against the normal operation of natural forces. And here the word 'normal' is used to describe not only those forces which are constantly and habitually operating but also those forces which operate periodically or with a certain degree of frequency."

While this definition is drawn from a discussion of negligence, nevertheless we think it correctly applies to the situation here. It is expressly approved in In re New Jersey Power & Light Co., 9 N.J 498, 89 A.2d 26, 41, in speaking of income and expense.

■ The insurer also excepted to the form of the issue on the ground that it over-emphasized "settling" and omitted the equally important matter of "expansion". Only the term "normal settling" was defined. In our opinion the issue and definition did not furnish to the jury a fair and adequate opportunity of passing upon the question of whether or not the damage was covered by the terms of the policy.

The insurer's expert testified to the effect that neither the digging of a storm sewer nor any of the work in connection therewith caused any of the damage complained of, but that it resulted from a movement of soil due to the absorption of moisture; that the house was built during a period of drouth and when the weather cycle changed the soil expanded with the moisture. The witness also testified that there was no settling either normal or abnormal, but that an expansion and upthrust of the soil produced the damage. The probable harm in this issue and definition as submitted is brought out rather clearly by Nelson's counsel in his argument to the jury. He argued that even if the jury thought there was an upthrust or expansion there was no settling according to the insurer's own witness. He also contended that even if there was any expansion it was confined to the soil and thus was not expansion in the "foundations" as provided in the exclusion clause; that there could be no expansion of the foundation because it was the earth that expanded and not the house foundation. In our opinion the clause is not to be so strictly construed.

■ think the words "settling" and "expansion" as used in the policy are to be construed as being antonymous to each other. The policy clause speaks of "settling in the foundation" and "expansion in the foundations". If we leave out of consideration settling and expansion caused by the action of the soil under the house and refuse to consider the soil as a part of the foundations, as the insured contends, then the clause would have little practical meaning. It is difficult to see how any substantial damage to a dwelling could be brought about by normal expansion and contraction only of concrete, wood and other building materials. Nor do we think that is what the terms of the policy import.

We are of the opinion therefore that the court erred in the submission of this issue and the accompanying definition.

■■ We further hold that there is no evidence in this case to support the jury finding of "partial collapse". Among the numerous photographs introduced by the in-

sured only three purport to show any damage to the house. One reveals a rather wide crack in the sheetrock extending downward from the bottom of a window casing. The other two show doors out of alignment. There is testimony also that a corner of the foundation had subsided three and one-fourth inches and that there was a sloping of the floors in the living room and in the back bedroom. There were cracks and settling in the driveway. These and similar facts merely support the conclusion that the damage to the house was the result of settling, shrinkage or expansion and not that the house "partially collapsed".

The term "partial collapse" was defined by the court as:

> "* * * a sinking, bulging, cracking or pulling away of the foundation or walls or other supporting structures so as to impair their function of supporting the superstructure and tending to destroy or impair the efficiency of the dwelling as a habitation."

We do not approve that definition. It embraces not only those flaws and defects which impair but even those which *tend* to impair "the efficiency of the dwelling as a habitation". It could very reasonably be said that even a slight settling or expansion of the foundation would tend to impair the efficiency and under this definition that would therefore constitute a "partial collapse". We thinks the term cannot be so broadly described.

The clause providing for coverage of loss caused by "collapse or partial collapse" is a rather recent development in contracts of insurance as is also the variant of that provision, namely, "collapse of a building or any part thereof". All of the authorities bearing on this question which we have found involve fact situations similar to the case at bar but the policy provision in each case was framed in terms of "collapse of a building or a part thereof". The Court of Civil Appeals has held this distinction to be

material in passing upon the correctness of the definition given by the trial court. In our opinion, however, if there be a distinction it is not material to our decision here.

■ The word "collapse" is not one of art, but is unambiguous and is generally understood to have the meaning of to fall or shrink together, to cave in, to fall into a flattened, distorted or disorganized state. Central Mutual Ins. Co. v. Royal, 269 Ala. 362, 133 So.2d 680, 72 A.L.R.2d 1283; Weiss v. Home Ins. Co., 9 A.D.2d 598, 189 N.Y.S.2d 355; Nugent v. General Ins. Co. of America, 8 Cir., 253 F.2d 800; Rubenstein v. Fireman's Fund Ins. Co., 339 Ill. App. 404, 90 N.E.2d 289; Gage v. Union Mutual Fire Ins. Co., 1961, 122 Vt. 246, 169 A.2d 29.

To the contrary are two cases from Kansas. Travelers Fire Ins. Co. v. Whaley, 10 Cir., 272 F.2d 288 purports to follow the Kansas rule in Grady v. Erhard, 143 Kan. 170, 53 P.2d 478. The Grady case, however, was concerned with a rental contract and construed the term "collapse" from the context of the lease saying, "Obviously the parties had 'tenantable condition' or 'fitness for occupancy' uppermost in their minds when they wrote into the lease the paragraph above." The Whaley case holds that if the company had intended that the word "collapse" be given its ordinary meaning it should have so stated in the policy. We do not agree with that philosophy.

In Jenkins v. United States Fire Ins. Co., 185 Kan. 665, 347 P.2d 417, the clause "collapse of building(s) or any part thereof" was held to be ambiguous and susceptible of more than one construction and interpreted as "the settling, falling, cracking, bulging or breaking of the insured building or any part thereof in such manner as to materially impair the basic structure or substantial integrity of the building is to be regarded as a 'collapse' of the building". The case was reversed because the trial court included in the definition the further condition "so as to render it unsuitable for use as a dwelling."

The Vermont Court in Gage v. Union Mutual Fire Ins. Co., supra, held that damage to a cottage consisting of a buckled ceiling, raising of the floor, plumbing out of line, door sill dropped five inches, splitting of fire place and pulling away of chimney, did not come within the coverage of a policy insuring against "collapse of building(s) or any part thereof". That court found itself in agreement with the construction given to the policy language in Central Mutual Ins. Co. v. Royal, supra, and expressly rejected both the reasoning and result reached in the two Kansas cases.

 Although contracts of insurance are said to be construed strictly in favor of the insured, nevertheless they are to be construed generally as other contracts, in that unambiguous words and phrases are to be taken in their ordinary meaning unless there is something in the contract that would indicate a contrary intention. United American Ins. Co. v. Selby, 161 Tex. 162, 338 S.W.2d 160. We see no reason why that rule should not apply here. If so then a partial collapse would certainly mean that the foundation or walls or other supporting structures had been impaired with respect to their function of supporting the superstructure. We think the term can be defined properly as a sinking, bulging, breaking or pulling away of the foundation or walls or other supports so as materially to impair their function and to render the house unfit for habitation.

In view of the necessity of a retrial we will refer briefly to two or three other matters that arose in the argument of plaintiff's counsel. In closing he conceded that he had "gotten out of line a few times" and from the record we conclude that he was not guilty of exaggeration in making that admission. Among the statements made are the following: that in view of the defense tactics and the denial of liability he would like to cancel his own policy; that Nelson would have to sell his house for cash because he could not get a loan; that because the company denied the adjuster's authority to waive proof of loss "they are lulled into a false sense of security; and are led like lambs to the slaughter". He also made remarks calculated to reflect on the honor and integrity of insurer's counsel. These or similar statements are erroneous and should not be repeated.

The insurer also complains of statements made by counsel to the effect that the insurer could recoup from the contractor any damages it was compelled to pay out on this claim. These statements were said to be invited because the insurer introduced in evidence a copy of the petition filed by Nelson and other home owners against the contractor for the same damages. While the policy did provide for subrogation we think that neither that matter nor the petition bore upon the matters in controversy in this case

Accordingly the judgment of the Court of Civil Appeals and that of the trial court are reversed and the cause remanded to the trial court.