OPINION *Page 2 
{¶ 1} Defendant-appellant Motorists Mutual Insurance Company appeals from the June 21, 2006 Judgment Entry of the Muskingum County Court of Common Pleas and the July 28, 2006 Nunc Pro Tunc Judgment Entry of the Muskingum County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellee Zanesville LLC owned property located at 511 Main Street in Zanesville, Ohio. At all relevant times, the property, which was known as the City Grille Building, was covered by an insurance policy issued by appellant Motorists Mutual Insurance Company. The policy states, in relevant part, as follows:
 {¶ 3} "A. COVERAGE — We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss. . . .
 {¶ 4} "D. ADDITIONAL COVERAGE — COLLAPSE — The term Covered Cause of Loss includes the Additional Coverage — Collapse as described and limited in D.1. through D.5 below.
 {¶ 5} "1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, . . .
 {¶ 6} "4. Collapse does not include settling, cracking, shrinkage, bulging, or expansion."
 {¶ 7} On June 12, 2001, at approximately 9:00 a.m., Robert Kessler, one of the partners in appellee Zanesville LLC, became aware that there was a problem with the *Page 3 
City Grille Building. When he arrived at the building, Kessler observed that "the front part of the wall was moving forward toward the street." Deposition of Robert Kessler at 24. According to Kessler, the wall was bowing and was pulling away from the building. When he looked up at the wall, the opening between the building and the front wall was approximately 3 to 4 inches. Kessler testified that "[i]t appeared that the whole front was coming off." Id at 27.
 {¶ 8} The following is an excerpt from Kessler's deposition testimony:
 {¶ 9} "Q. Okay. All right. Now, when you got there, the wall was still standing, although it was in the condition that you have described it?
 {¶ 10} "A. Well, there is — — there was pieces crumbling off the building.
 {¶ 11} "Q. Okay. Describe what was on — — you say pieces crumbling off the building. What do you mean by that?
 {¶ 12} "A. Concrete, mortar, that product, possibly a part of a brick, you know.
 {¶ 13} "Q. And where was that? Was that on the sidewalk underneath the wall?
 {¶ 14} "A. When it — — when it fell?
 {¶ 15} "Q. Yes, sir.
 {¶ 16} "A. Yes.
 {¶ 17} "Q. Okay. How would you describe the quantity that you saw?
 {¶ 18} "A. I — — I would say there was maybe a total of a gallon bucket." Deposition of Robert Kessler at 28-29.
 {¶ 19} Between 9:00 a.m. and 10 a.m., Kessler spoke with James Waymer, the chief building official of the Mid-East Ohio Building Department. When Waymer, who has an engineering degree, arrived on the scene, he observed a "large gap in the wall." *Page 4 
Deposition of James Waymer at 23. Waymer testified that the gap was approximately 18 inches or more in width and that the wall was separating from the top of the building along the entire length of the front of the building. Waymer also observed "little pieces of brick" from the building on the ground. Deposition of James Waymer at 31. Based on the condition of the building, Waymer determined that the same was in danger of imminent collapse and needed to be torn down.
 {¶ 20} Kessler and Mike Nash, another partner/shareholder in appellee Zanesville LLC, then called James Sons "to control the collapse" with a large backhoe. Deposition of Robert Kessler at 38. Kessler testified that he told Mr. James of James Sons that he wanted him "to take the front parcel off and the sides." Deposition of Robert Kessler at 38-39. According to Kessler, when James Sons arrived, part of the front wall had fallen whereas part of the wall was still standing.
 {¶ 21} When James Sons arrived, the building was still standing as was the front wall. James Sons then used a backhoe to take the wall down and to demolish the entire building.
 {¶ 22} After appellant denied coverage to appellee, determining that there had not been a "collapse" of the building, appellee, on April 8, 2002, filed a complaint against appellant in the Muskingum County Court of Common Pleas. Appellee, in its complaint, alleged that appellant had breached its insurance contract with appellee and had acted in bad faith in failing to pay appellee's claims. Appellee, in its complaint, alleged that the value of the City Grille Building at the time of its collapse was $310,000.00 and also that the Kresge Building, an adjacent building owned by appellee, had suffered damages that required repair in the amount of $26,424.72. *Page 5 
 {¶ 23} On April 26, 2004, appellant filed a Motion for Summary Judgment, arguing that the losses and damages suffered by appellee were not covered losses under the policy of insurance issued by appellant to appellee. Pursuant to a Judgment Entry filed on July 28, 2004, the trial court denied such motion. The trial court, in its entry, stated, in relevant part, as follows: "[i]n the present case, the issue appears to be one involving the interpretation of the word `collapse' and its application to the policy of insurance in question in light of the `emergency' conditions at the time and place of this occurrence. The Court concludes that a genuine issue of material fact exists."
 {¶ 24} Appellant resubmitted its Motion for Summary Judgment on December 27, 2005 and the same was denied on March 22, 2006.
 {¶ 25} Subsequently, on May 3, 2006, appellee filed a Motion for Summary Judgment. Appellee also filed a Supplemental Motion for Summary Judgment on May 15, 2006.
 {¶ 26} Pursuant to a Judgment Entry filed on June 21, 2006, the trial court granted summary judgment as to coverage, but overruled appellee's motion with respect to the issue of damages. The trial court, in its June 21, 2006 Judgment Entry, stated, in relevant part, as follows:
 {¶ 27} "Unquestionably, a collapse occurred on June 21, 2001 [sic]. As defined in Olmstead Falls v. Lumberman, there was a falling down of a small number of bricks and mortar. Pursuant to the policy of insurance, a part of the insured building collapsed. On June 12, 2001, the actual collapse (as defined in the plain language of the policy) of the building began. To require the Plaintiff to irresponsibly allow for an eventual catastrophic complete collapse of said property is against public policy. Once the *Page 6 
insured building began to collapse, Plaintiff acted properly in controlling the continued collapse of the building, thus protecting the public and providing an orderly collapse versus an uncontrolled chaotic collapse.
 {¶ 28} "To require a total collapse of a building before coverage ensues would require every single brick to be disengaged from all other brick and mortar. The absurdity of that requirement is self-evident. Defendant wrote a policy that provided coverage when any part of thebuilding collapses. A total collapse is not required."
 {¶ 29} On July 28, 2006, the trial court issued a Nunc Pro Tunc Judgment Entry including the language mandated by Civ.R. 54(B). The trial court, in such Judgment Entry, indicated that "there is no just reason for delay."
 {¶ 30} Appellant now raises the following assignment of error on appeal:
 {¶ 31} "THE TRIAL COURT ERRED IN GRANTING PLAINTIFF-APPELLEE'S MOTION FOR SUMMARY JUDGMENT BY FINDING THAT THERE WAS A COLLAPSE OF PLAINTIFF-APPELLEE'S BUILDING AND THAT THERE WAS THEREFORE COVERAGE UNDER THE POLICY OF INSURANCE ISSUED BY DEFENDANT-APPELLANT TO PLAINTIFF-APPELLEE."
 {¶ 32} In turn, appellee raises the following assignment of error on cross-appeal:
 {¶ 33} "OHIO REVISED CODE SECTION 3929.25 REQUIRES INSURANCE CARRIERS INSURING BUILDINGS OR STRUCTURES AGAINST LOSS BY FIRE OR LIGHTENING TO FIX IT'S [SIC] INSURABLE VALUE. IN THE EVENT OF A LOSS, EVEN IF NOT BY FIRE OR LIGHTENING, THE INSURED IN ENTITLED TO BE PAID THE WHOLE AMOUNT MENTIONED IN THE POLICY." *Page 7 
 I {¶ 34} Appellant, in its sole assignment of error, argues that the trial court erred in granting summary judgment to appellee. Appellant specifically contends that the trial court erred in finding that there was a collapse of appellee's building and that, therefore, there was coverage under the insurance policy issued by appellant to appellee. We disagree.
 {¶ 35} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987),30 Ohio St.3d 35, 36, 506 N.E.2d 212. As such we must refer to Civ.R. 56(C), which provides in pertinent part: "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . A summary judgment shall not be rendered unless it appears from such evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in the party's favor."
 {¶ 36} Pursuant to the above rule, a trial court may not enter summary judgment if it appears a material fact is genuinely disputed. Further, trial courts should award summary judgment with caution. "Doubts must be resolved in favor of the non-moving *Page 8 
party." Murphy v. Reynoldsburg, 65 Ohio St.3d 356, 359, 1992-Ohio-95,604 N.E.2d 138. It is pursuant to this standard that we review appellant's assignment of error.
 {¶ 37} At issue in the case sub judice is whether or not there is coverage under the insurance policy issued by appellant to appellee. As is stated above, the insurance policy states, in relevant part, as follows:
 {¶ 38} "A. COVERAGE — We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss. . . .
 {¶ 39} "D. ADDITIONAL COVERAGE — COLLAPSE — The term Covered Cause of Loss includes the Additional Coverage — Collapse as described and limited in D.1. through D.5 below.
 {¶ 40} "1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, . . .
 {¶ 41} "4. Collapse does not include settling, cracking, shrinkage, bulging, or expansion." (Emphasis added).
 {¶ 42} While the trial court held that there was a "collapse" of the City Grille Building and that, therefore, there was coverage under the policy, appellant disagrees. Appellant argues that there was no "collapse" and that appellee is not entitled to coverage because, based on the "danger of collapse" appellee made a conscious decision to have the building razed.
 {¶ 43} In Olmstead v. Lumbermen's Mut. Ins. Co. (1970),22 Ohio St.2d 212, 216, 259 N.E.2d 123, the Ohio Supreme Court construed the word "collapse," which had not *Page 9 
been defined in an insurance policy, and held that in its plain, common and ordinary sense, "collapse" means an actual falling down, falling together, or caving into an unorganized mass. As noted by the court inOlmstead, "[t]he assertion by plaintiffs that the parties intended the word `collapse' to have a broader meaning imposes the burden on plaintiffs of establishing that such was the true intent of the parties. As the Supreme Court of Texas said in Employers Mutual Cas. Co. of DesMoines, Iowa v. Nelson (Tex.), 361 S.W.2d 704, at 709: `Although contracts are * * * to be construed strictly in favor of the insured, nevertheless they are to be construed generally as other contracts, in that unambiguous words and phrases are to be taken in their ordinary meaning unless there is something in the contract that would indicate a contrary intention.' "Id. at 216.
 {¶ 44} In the case sub judice, appellant has presented no evidence concerning any contrary intent of the parties. For such reason, the word "collapse" must be given its ordinary and common meaning.
 {¶ 45} In the case sub judice, there was evidence before the trial court that part of the City Grille Building had collapsed. There was testimony from both Robert Kessler and James Waymer that bricks from the building were on the ground in front of the building. As is stated above, Kessler testified that, when he arrived on the scene, pieces were crumbling off of the building and that concrete, mortar and parts of a brick were on the sidewalk underneath the wall. Waymer, when asked whether there was any debris on the ground, testified that there were "little pieces of brick here and there." Deposition of James Waymer at 31. Thus, in contrast to the cases cited by appellant in its brief,[1] *Page 10 
there was evidence that part of appellee's building actually fell. As is stated above, the subject insurance policy covers direct physical loss or damage caused by collapse of any part of a building.
 {¶ 46} Based on the foregoing, we find that the trial court did not err in granting appellee's Motion for Summary Judgment on the issue of coverage. Reasonable minds, construing the evidence in appellant's favor could only conclude that part of appellee's building collapsed.
 {¶ 47} Appellant's sole assignment of error is, therefore, overruled.
 CROSS-APPEAL {¶ 48} Appellee, in its assignment of error on cross-appeal, argues that the trial court erred in overruling appellee's Motion for Summary Judgment on the issue of damages. Appellee specifically maintains that, pursuant to R.C. 3929.25, it is entitled to be paid the full value of its loss ($310,000.00) suffered in this case.
 {¶ 49} However, we find that this issue is premature because the issue of damages owed has yet to be determined. The trial court, in its July 28, 2006, Nunc Pro Tunc Judgment Entry, stated that final judgment was "rendered as to coverage." (Emphasis added). The trial court never reached the issue of damages. This issue will become relevant once damages are determined. At that point, the trial court must determine the applicability of the cited provision, i.e. determine the amount of "direct *Page 11 
physical loss or damage to Covered Property, caused by collapse" of "any part of a building insured under this Coverage Form."
 {¶ 50} Appellee's sole assignment of error on cross-appeal is, therefore, overruled.
 {¶ 51} Accordingly, the judgment of the Muskingum County Court of Common Pleas is affirmed.
Edwards, J. Hoffman, P.J. and Delaney, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Muskingum County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] For example, in Sharritt v. Celina Mut. Insurance Co. (Aug. 17, 1984), Montgomery App. No.CA 8531, 1984 WL 3828, cited by appellant in its brief, the court noted that "[i]t is undisputed that no part of appellant's house actually fell or caved in . . ." Id. at 2. The court, in Sharritt, rejected the argument that the "imminent collapse" of a house was covered noting that Ohio law requires an actual collapse. InSchrock v. Feazel Roofing Co ., Delaware App. No. 02CAE10049, 2003-Ohio-3742, this Court noted that there was no dispute that there was no actual physical collapse of the appellant's house or any part thereof. Id. at paragraph 60. Finally, in the Olmstead case, the court noted that no part of any wall or building fell down or disintegrated. *Page 1